## No. 15,079.

BRYANT ET AL. *v.* HAYDEN COAL COMPANY ET AL.

(137 P. [2d] 417)

Decided May 3, 1943.

Mr. PHILIP HORNBEIN, Mr. PHILIP HORNBEIN, JR., Mr. LOUIS SCHIFF, for plaintiffs in error.

Messrs. LEWIS & GRANT, Mr. STEPHEN H. HART, for defendants in error.

*En Banc.*

Mr. Chief Justice Young delivered the opinion of the court.

This cause is before us on writ of error to review a judgment of the district court which set aside an award of the Industrial Commission granting unemployment compensation to the individual claimants. We herein refer to plaintiffs in error as claimants, or the men; the Hayden Coal Company being designated as the operator, or employer. Claimants prosecute the writ of error. The points specified on which they rely for a reversal of the judgment are as follows: "1. Whether the unemployment of claimant was due to a strike or to the act of the employer in disabling itself from continuing ordinary mining operations was a question of fact concerning which there was a dispute in the evidence, and hence the findings of the Commission must stand. 2. The action was not commenced within the period provided by statute."

The general background out of which this controversy arose involved the expiration of the same contract as was involved in the case of *Sandoval v. Industrial Commission,* reported in 110 Colo. 108, 130 P. (2d) 930, heretofore reviewed by us. For an understanding of the underlying facts that case should be read in connection with this opinion. The same section of the statute, Colorado Employment Security Act, chapter 167A, '41 Supp. '35 C.S.A., is here involved. Except for certain facts hereinafter mentioned, allegedly distinguishing this from the Sandoval case, supra, it is a companion case to it and counsel for plaintiffs in error so recognize it in their brief. The alleged distinction lies in the following situation: The contract under which claimants were working was to expire on March 31, 1941. The operator, for a number of months prior thereto, had under consideration the project of sinking its shaft to a deeper level. Prior to March 28, 1941, the last day on which the men worked, a notice had appeared on a bulletin board ad-

vising the men to fill their private bins with coal. The operator had accumulated a supply of fifty or more carloads of coal. The record does not disclose that the operator ever summoned any men to mine coal after March 28. It does show that if called, the men would not have worked without either a new contract based on the Appalachian agreement, or an interim contract making any subsequently-agreed scale retroactive to April first. At the time the hearing was held in this case, May 13, 1941, the operator still had a number of cars of lump coal left, but had purchased some coal of smaller size from other operators to fill the orders of some of its customers.

The record indicates that April is a slack month in coal production, and over a period of five years the operator had worked its mine in April, five, two, five, six and thirteen days; and in May, three, eight, four, two and twelve days. June and July are on about the same production basis, and August is somewhat better. It appears that the operator had considered the matter of sinking the shaft during the summer, but experience showing that there was generally a period of inactivity between the termination of one two-year contract and the consummation of a new one, and none having been consummated on March 28, the operator proceeded with sinking the shaft. It appeared that with considerable inconvenience it was possible to sink the shaft without closing it to the hoisting of coal; further, that the shaft, after being rigged for the deeper sinking, could be prepared for hoisting coal at a cost of $250 in from five to twenty-four hours, and the testimony was that if the contract had been signed and the men willing to work, and the operator had a demand for coal, it would have gone back on a production basis.

A number of mining companies in the northwestern Colorado field signed an interim agreement. Whether, with no shaft to sink and a substantial demand for coal, the operator in this case would have signed such an agree-

ment, does not appear and a consideration of such a situation would be pure speculation.

The case is not free from difficulty. The operator changed his hoist equipment to sink the shaft deeper, so it was not available for mining coal without changing it back. It would not have changed back unless a contract were signed *and there was a demand for coal.* The demand was as slack at this particular season of the year as in any other season. The sinking of the shaft had been projected for some time. The commission found as a fact that the operator voluntarily ceased operations and engaged in sinking a shaft March 28, three days before there was any ground for a labor dispute, and that no strike then existed. It continued such cessation of operations and work on the shaft beyond the date of the hearing. Whether the operator would have switched back to production if a contract had been signed, or would have signed an interim contract if not digging a shaft, or whether the miners would have worked otherwise if summoned, are matters not susceptible of direct proof, for no contract was signed and no work offered.

We may surmise from the record that the men were desirous of receiving compensation and that they would not have worked if called, and that the operator was desirous of closing the mine at a time when it might sink the shaft without paying compensation to the men as for a voluntary suspension of operations. One surmise may very well offset the other. On a matter incapable of demonstration, as most matters involving human relations are, the commission, the fact finding body, heard evidence and found the shutdown voluntary and that during the period for which compensation is claimed the mine was not in such condition that coal could be produced therefrom and that for the period of such incapacity the men were entitled to unemployment benefits. We are of the view that this finding of fact should not have been set aside by the district court. It

was the result of a resolution on conflicting evidence and this is the function of the commission under the act. If the commission's findings of fact are supported by substantial evidence, they are binding upon subsequently reviewing judicial tribunals.

As to the second specified point for reversal, we hold it is not well taken. The Employment Security Act, section 6 (k), chapter 167A, '35 C.S.A., '42 Cum. Supp. is in part as follows: "Within twenty days after the decision of the commission has become final any party aggrieved thereby may secure judicial review thereof by commencing an action in the district court of the county where the claim for benefits was filed, or of the City and County of Denver for the review of the commission's decision in the same manner as reviews are now provided by law in workmen's compensation cases."

The act, as we understand it, fixes the time for "commencing an action in the district court" as, "within twenty days after the decision of the commission has become final." Section 6 (j) of the act provides that such a decision "shall become final ten days after the date of notification or mailing notice thereof." It becomes final in ten days only in the absence of an appeal therefrom. That the appeal therein mentioned does not refer to the commencing of an action in the district court for review provided for in section 6 (k) is clear from the fact that under that section an action may be commenced only "within twenty days after the decision of the commission has become final." The appeal mentioned in 6 (j) clearly must be an appeal to the commission. That such is intended is apparent from 6 (f) wherein it is provided that, "The commission may on its own motion affirm, modify, or set aside any decision of a referee on the basis of the evidence, previously submitted in such case, or direct the taking of additional evidence." Such action clearly would be the action of and produce a finding and award of the commission. Notwithstanding, this same section further provides that,

*"The commission shall permit any of the parties to* initiate further appeals before it." (italics ours) While the use of the word "appeal" to signify what is in effect a rehearing before the tribunal rendering the appealed decision, is not the usual and ordinary sense in which the word is used, we think the context requires such a construction in order to make intelligible the various provisions of the act hereinbefore mentioned. We conclude, therefore, that the appeal, or application for a rehearing before the commission while not mandatory, was permissible. Having been made within the ten days before the commission's award became final, it stayed the finality of the award until ten days after the appeal was determined and the required notice given. The institution of the action in the district court being within twenty days after the ten days from notice of determination of the appeal was given making the award of the commission final, was within the time provided by the act.

The judgment of the district court is reversed, and the cause remanded; further proceedings, if any, to be consistent with the views herein expressed.