MUNCIE FOUNDRY DIVISION OF BORG-WARNER CORPORA-
TION V. REVIEW BOARD OF UNEMPLOYMENT
SECURITY DIVISION ET AL.

[No. 17,177.   Filed December 16, 1943.   Rehearing denied
January 11, 1944.   Transfer denied February 10, 1944.]

*Bracken, Gray & DeFur,* of Muncie, for appellant.

*Andrew Jacobs,* of Indianapolis, for appellees.

FLANAGAN, J.—This action is based upon claims filed under the Employment Security Act, § 52-1501 *et seq,* Burns' 1933' (Supp.), § 10168-1 *et seq,* Baldwin's Supp. 1937, by approximately 195 workers, for unemployment benefits for the period from January 2 to January 25, 1943, caused by a stoppage of work which occurred at a plant in Muncie, Indiana, owned prior to January 1, 1943, by Muncie Foundry Division of Borg-Warner Corporation, and after January 1, 1943, by Frank Foundries Corporation. The Review Board held that the claimants were entitled to receive unemployment benefits.

The question here is whether the evidence is sufficient to sustain the decision of the board. Appellant contends that the evidence does not sustain the finding of the board (1) that appellees did not refuse an offer of suitable work, and (2) that the stoppage of work was not due to a labor dispute.

The evidence most favorable to appellees establishes the following facts:

On November 30, 1942, the Muncie Foundry Division of Borg-Warner Corporation notified its employees' union that it had concluded negotiations for the sale of its assets and therefore cancelled its contract with the union as of December 31, 1942. The name of the purchaser was not given in the notice.

On December 14, 1942, the plant superintendent of the Muncie Foundry Division of Borg-Warner Corporation informed the officers and grievance committee of the employees' union that the plant had been sold to another corporation and that possession would be delivered on January 1, 1943, but that he was not at liberty to disclose the name of the purchaser.

On December 24, 1942, the following notice was posted at the plant:

"This plant will be down from this evening until January 4th or 5th, 1943, for inventory and change of ownership.

"All employees will receive their pay in full next Thursday, December 31st.

"This office will be open Monday next week, December 28th, through December 31st, to receive applications for employment.

"FRANK FOUNDRIES CORPORATION."

No general operations were carried on at the plant from December 24, 1942, to January 4, 1943, except the taking of inventories and some cleaning up operations.

On December 30, 1942, the attorney for Frank Foundries Corporation went to the plant and there conferred with three members of the bargaining committee of the employees' union and three other employees. He informed them that the purchaser intended to run the plant, but that since it was a new employer in a new territory it would only be able to pay prevailing wages in the territory, which was less than the employees of Muncie Foundry Division of Borg-Warner Corporation had been receiving; that they would have to sign applications for employment and be hired individually as new employees. In response to a question as to whether all the former employees of Borg-Warner Corporation would be employed by the purchaser, he said that there were men in the union that both the union and the company would be better off without.

On January 1, 1943, the purchaser took possession of the plant. On January 2, 1943, several of the employees parked their cars in front of the main entrance to the plant. On January 4, 1943, workers began to picket the plant and no one was thereafter allowed to go in until January 12 when the picketing ceased.

No applications for employment were made as requested by the notice or by the attorney for the purchaser.

On January 5, 1943, a conciliator called at the plant and talked to its superintendent and the attorney for the new owner who informed him that they could not say definitely that all the men would be re-employed and that they did not consider the employees of Borg-Warner Corporation as the employees of Frank Foundries Corporation.

On January 8, 1943, representatives of the Frank Foundries Corporation called on the Governor and the State Division of Labor at Indianapolis and then upon

the representative of the employees' International Union. The representatives of the International Union agreed to call off the picket line and instruct the men to sign applications and go to work at a reduced pay if necessary. There was no picketing after January 11th.

On January 18th, at a hearing before a Mediation Panel of the National War Labor Board in Chicago, an agreement was reached in settlement of differences between the workers and the Frank Foundries Corporation. However, the representative of the Frank Foundries Corporation informed the board that his company would not be ready to open the plant for thirty days, that the company wanted to put in some new equipment and make some changes, and the company engineers said it would be thirty days before the plant would be in shape to open. The board said the castings to be made at the plant were needed and urged an earlier opening. A representative of the Army said that if the company could not open the plant the Army would. The representative of Frank Foundries Corporation called the plant superintendent on the phone and then called the company office at Moline and they agreed to open on January 25th. The plant did open on that date.

All products of the plant are sold to the Warner Gear Division of the Borg-Warner Corporation which is engaged in war production.

The parties hereto agree as to the following propositions:

1. The original stoppage of work was due solely to lack of available employment.

2. There was a labor dispute at the plant which began not later than January 2, 1943, and continued to January 18, 1943.

We think the following propositions are also evident:

1. The purpose of the Employment Security Act, § 52-1501 *et seq.*, Burns' 1933 (Supp.), § 10168-1 *et seq.*, Baldwin's Supp. 1937,. is to provide benefits to those who are involuntarily out of employment, and not to finance those who are willingly and deliberately refusing to work because of a failure of their employers to accede to demands for higher wages. *Walter Bledsoe Coal Co.* v. *Review Board* (1943), 221 Ind. 16, 46 N. E. (2d) 477. This proposition has particular force in time of war when excluding the owners of war producing plants by picket lines cannot be condoned in any degree.

2. If unemployment is originally caused by lack of work but thereafter the employee is offered suitable work by an employing unit and he refuses to accept the work, he is thereafter disqualified for benefits under the act. § 52-1507 (f) (2), Burns' 1933 (Supp.).

3. If unemployment is originally caused by lack of work but thereafter work becomes available at the factory, establishment or other premises where he was last employed, and the employee refuses to work because of a labor dispute at such place in which he is participating, he is thereafter disqualified for benefits under the act. § 52-1507 (f) (3), Burns'. 1933, (Supp.).

4. If unemployment is originally caused by lack of work and a labor dispute develops during the continuance of the unavailability of work, such labor dispute does not disqualify the employee until work becomes available and he refuses the work because of the labor dispute. § 52-1507 (f) (3), Burns' 1933 (Supp.).

With the above propositions in mind we proceed to

examine the contentions of the parties in the light of the evidence.

Appellant contends that the evidence shows that the claimants were disqualified under § 52-1507 (f) (2), Burns' 1933 (Supp.), the applicable portion of which reads as follows:

"(f) Disqualification for Benefits. An individual shall be ineligible for waiting period or benefit rights:

"(2) If the division finds that being totally, partially or part-totally unemployed, and otherwise eligible for benefits, he has failed, without good cause, either to apply for available, suitable work when so directed by the director or the deputy, or to accept suitable work when found for and offered to him by the director or the deputy or by an employing unit, or to return to his customary self-employment (if any) when so directed by the director or the deputy. . . ."

We cannot agree with this contention. The mere offer of the opportunity to file an application for work with possibility of acceptance of the application and the possibility of work to follow such acceptance, does not amount to the offer of suitable work. It will be noted that the above section of the statute itself differentiates between applying for work and acceptance of work offered. Under this section if *any employing unit offers work* and the employee fails without good cause to *accept* such work he is disqualified from receiving benefits. But he is disqualified for failure to apply for available, suitable work only when he has been directed to do so by the director or the deputy of the Indiana Employment Security Division.

Our holding that an offer of the opportunity to apply for possible work by an employing unit does not

amount to an offer of work under the particular
section above quoted is not to be understood to
mean, however, that an employee can refuse to
work because of a labor dispute and excuse his refusal
by saying that he was required to sign an application
or that his application might not be accepted.

The section of the act relating to disqualifica-
tion because of a labor dispute reads as fol-
lows:

"(f) Disqualification for Benefits. An individ-
ual shall be ineligible for waiting period or benefit
rights:

"(3) For any week with respect to which the
board finds that his total or partial or part-total
unemployment is due to a stoppage of work which
exists because of a labor dispute at the factory,
establishment or other premises at which he was
last employed; Provided that this subsection shall
not apply if it is shown to the satisfaction of the
board that: He is not participating in or financing
or directly interested in the labor dispute which
caused the stoppage of work; and he does not be-
long to a grade or class of workers of which, im-
mediately before the commencement of the stop-
page, there were members employed at the prem-
ises at which the stoppage occurs, any of whom are
participating in or financing or directly interested
in the dispute; and he has not voluntarily stopped
working, other than at the direction of his em-
ployer, in sympathy with employees in some other
establishment or factory in which a labor dispute
is in progress; Provided, That if in any case sep-
arate branches of work, which are commonly con-
ducted as separate businesses in separate prem-
ises, are conducted in separate departments of the
same premises each such department shall, for the
purpose of this subsection, be deemed to be a sep-
arate factory, establishment, or other premises."
§ 52-1507 (f) (3), Burns' 1933 (Supp.).

Under this section, if work is available at the factory, establishment, or other premises at which he last worked, and an employee fails to make himself available for the work by compliance with reasonable formalities, but avoids the work because of a labor dispute there existing in which he is participating, he is disqualified for benefits.

In the case at hand such a labor dispute did exist and the employees did not sign applications for work. If work existed at the plant the conclusion would seem inevitable that the failure to work was due to the labor dispute. If, on the other hand, the lack of available work at the plant which caused their original unemployment continued to exist throughout the period in which the labor dispute existed, a finding that the unemployment of the claimants was not due to the labor dispute would be sustained by the evidence. The vital factual question then is whether work was available at the plant during the time of the labor dispute.

As bearing upon this subject it is to be noted that there is no direct evidence as to any work being available. The only inferential evidence of work being available is whatever may be drawn from the notice posted at the plant on December 24, 1942, and the request by the new owner that applications for work be signed. On the contrary, there is undisputed evidence that no work was available. When a settlement of the labor dispute was effected on January 18th the owner was not ready to start operations for yet another month. It was not contended by the representatives of the owner that this was caused in any part by the labor dispute.

The evidence does disclose that a week of this delay might have been caused by the fact that the owner was

kept out of the plant that long by the picket lines. There is nothing else in the evidence to indicate that any other part of the delay in opening could have been caused by the labor dispute. Clearly it was the intention of the owner not to open for a period of one month after January 18th. If the owner had been permitted to make use of the week when the plant was picketed to further its preparations it is fair to infer that the plant would still not have been opened until three weeks after January 18th. The earlier opening on January 25th was the result, not of the intention of the owner to make work available prior to sometime in February, but the insistence of the War Labor Board and the Army's representative. It should be noted that it was the labor dispute that brought the matter to their attention.

We think this evidence is sufficient to sustain a finding that the unemployment of the claimants was not due to a labor dispute.

Award affirmed.

NOTE.—Reported in 51 N. E. (2d) 891.