PETER J. SWEENEY, CLAIMANT-APPELLANT-CROSS-RE-
SPONDENT, v. BOARD OF REVIEW, DIVISION OF EM-
PLOYMENT SECURITY, DEPARTMENT OF LABOR AND
INDUSTRY, STATE OF NEW JERSEY, RESPONDENT-
RESPONDENT-CROSS-APPELLANT, AND BREYER ICE
CREAM DIVISION OF NATIONAL DAIRY PRODUCTS,
RESPONDENT.

Argued November 2, 1964—Decided January 12, 1965.

536

*Mr. Edward A. Kaplan* argued the cause for respondent-cross-appellant Board of Review.

*Mr. Thomas Grant Bernard* argued the cause for appellant-cross-respondent (*Messrs. Bernard & Bernard,* attorneys).

The opinion of the court was delivered by

WEINTRAUB, C. J. The Division of Employment Security demanded that Peter J. Sweeney repay unemployment compensation benefits totaling $450. The demand rested upon the Division's determination that Sweeney was disqualified because his unemployment was attributable to a labor dispute. The agency's Appeal Tribunal and Board of Review agreed. The Appellate Division affirmed. 81 *N. J. Super.* 90 (1963).

Sweeney petitioned for certification. So also did the Board of Review which complained of the holding of the Appellate Division that a transcript of the testimony before the agency had to be furnished without charge to the claimant. We granted both petitions. 41 *N. J.* 600 (1964).

I.

The Unemployment Compensation Law provides in *N. J. S. A.* 43:21–5(d) that an individual shall be disqualified:

"For any week with respect to which it is found that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed;"

subject to provisos not here involved.

Sweeney was employed in the production department of the Newark plant of the Breyer Ice Cream Division of the National Dairy Products Corporation (Breyer). He was a member of Teamsters Union Local 680 which, together with Locals 338 and 757, was a party to a collective bargaining agreement with Breyer and other employers in the ice cream business in the Greater New York and Northern New Jersey area.

On March 2, 1962 Breyer posted a notice that all manufacturing operations in the production department of the Newark plant would be discontinued because of economic conditions, and that all employees of the production department would be laid off on March 31. About the middle of that month negotiations began for a new collective bargaining agreement, the existing one being due to expire on April 30. Local 680 objected to the proposed shutdown of the production department, and it is agreed that two of the major issues involved in the negotiations were the proposed shutdown and a demand for a guarantee of employment for all employees. A strike of the entire Newark plant was threatened if Breyer pressed its plan to close the production department. Breyer canceled the March 2 notice mentioned above. On April 23 it

posted a like notice fixing April 30 as the date of layoff. This notice was replaced on April 27 with another fixing May 4 as the final date.

On May 1 Local 757 called a strike against one of the Greater New York employers. The Industry Labor Committee, deeming this to be a "whipsaw" tactic designed to fragmentize the bargaining unit, notified the three locals that the employer members would immediately suspend operations at all plants. Breyer locked out its employees on May 2.

A new contract was reached on July 3. On July 9 all departments of the Newark plant reopened and Sweeney returned to work. The resumption of production became feasible because another company agreed to have ice cream manufactured for it by Breyer at the Newark plant.

### A.

The Unemployment Compensation Law seeks to ameliorate the impact of involuntary unemployment. *R. S.* 43:21-2. If the failure of the employer and the employees to agree upon a basis for continued employment leads to unemployment, the unemployment is neither voluntary nor involuntary in an absolute sense. The situation presents a legislative policy question, whether the employees should be able to draw upon the statutory fund to assist them during the dispute. The Legislature adopted an attitude of "neutrality," *i. e.*, that the fund may not be used, *Febbi v. Board of Review,* 35 *N. J.* 601, 606 (1961); *Westinghouse Electric Corp. v. Board of Review,* 25 *N. J.* 221, 227–228 (1957), with however some significant limitations. *N. J. S. A.* 43:21-5(d), quoted above, requires "a stoppage of work which exists because of a labor dispute." Thus the employer too must experience the impact of inactivity on account of the labor dispute. Further the statute requires that "his [the claimant's] unemployment" be due to such labor-dispute work-stoppage. Hence the mere existence of a labor dispute is not enough to disqualify.

Accordingly in *Radice v. New Jersey Dept. of Labor and Industry*, 4 *N. J. Super.* 364 (*App. Div.* 1949), the disqualification was deemed to end when the employer replaced the strikers and resumed normal operations. Although the labor dispute continued, there was no longer a "work stoppage" and hence the unemployment could no longer be attributed to a work stoppage caused by a labor dispute. In *Great A. & P. Tea Co. v. New Jersey Dept. of Labor*, 29 *N. J. Super.* 26, 31 (*App. Div.* 1953), where the work stoppage and unemployment were initially caused by a labor dispute, it was held that when the employer decided to end the business operation involved, it "brought the work stoppage to an end, for there was no work available from that time on." The disqualification thereupon ended. To the same effect are *Intertown Corp. v. Appeal Board*, 328 *Mich.* 363, 43 *N. W. 2d* 888 (*Sup. Ct.* 1950); *Marathon Electric Mfg. Corp. v. Industrial Comm.*, 269 *Wis.* 394, 69 *N. W. 2d* 573, 70 *N. W. 2d* 576 (*Sup. Ct.* 1955). The validity of that view was accepted in *Gerber v. Board of Review*, 36 *N. J. Super.* 322 (*App. Div.* 1955), affirmed 20 *N. J.* 561 (1956), where it was found that the discontinuance of the operations was temporary, rather than permanent as in *Great A. & P. Tea Co.*, and for that reason the work stoppage and the unemployment of the claimants continued to be the result of the labor dispute.

Elsewhere it is generally agreed that the existence of a labor dispute is not itself enough to lead to disqualification; the labor dispute must be the cause of the unemployment. See Shadur, "Unemployment Benefits and the 'Labor Dispute' Disqualification," 17 *U. Chi, L. Rev.* 294, 313-17 (1950); Williams, "The Labor Dispute Disqualification — A Primer and Some Problems," 8 *Vand. L. Rev.* 338, 344-45 (1955); Lewis, "The Law of Unemployment Compensation in Labor Disputes," 13 *Lab. L. J.* 174, 183 (1962); Note, 10 *Geo. Wash. L. Rev.* 604, 615 (1942). Accordingly courts have held that "if unemployment is originally caused by a lack of work and a labor dispute develops during the unavailability of work, the dispute does not disqualify the employee until work be-

comes available and he refuses the work because of the dispute." 81 *C. J. S. Social Security and Public Welfare* § 187, p. 281; *Bryant v. Hayden Coal Co.,* 111 *Colo.* 93, 137 *P. 2d* 417 *(Sup. Ct.* 1943); *Muncie Foundry Division of Borg-Warner Corporation v. Review Board,* 114 *Ind. App.* 475, 51 *N. E. 2d* 891 *(App. Ct.* 1943); *Jones & Laughlin Steel Corp. v. Unemployment Compensation Board of Review,* 202 *Pa. Super.* 209, 195 *A. 2d* 922 *(Super. Ct.* 1963).

## B.

■■ No doubt there was a labor dispute in the case before us, see *Ablondi v. Board of Review,* 8 *N. J. Super.* 71, 76 *(App. Div.* 1950); and the fact that there was a lockout rather than a strike is here of no moment. *Mortensen v. Board of Review,* 21 *N. J.* 242, 245–246 (1956); *Schoenwiesner v. Board of Review,* 44 *N. J. Super.* 377 *(App. Div.* 1957).

The critical question is whether Sweeney's unemployment was the product of a work stoppage caused by the labor dispute. We think it was not. We could not say it was unless we found Breyer's notice of termination of its manufacturing operations was merely a pretense in the course of labor negotiations. There is nothing in the record to suggest that Breyer was other than dead earnest. It did not even purport to cancel the notice of layoff when it locked out its employees. Indeed its general manager testified as to the notice of layoff:

"Q. So the notice you sent out was an [in?] anticipation of lack of work, not by virtue of the labor dispute?
A. That's right."

■ The labor dispute disqualification presupposes an employer willing to provide work and employees willing to work, but with the parties in disagreement as to the basis for continued work. If the employer refuses to provide work for an employee upon any terms, then, although a strike or lockout may ensue, it cannot be said as to that employee that

his unemployment or the work stoppage is attributable to the dispute. Here, Sweeney did not refuse an opportunity to continue his employment. His unemployment, far from being the product of a labor dispute, was in part the genesis of it. His unemployment was due to Breyer's decision to shut down the production department for unrelated economic reasons. Accordingly he was not disqualified under *N. J. S. A.* 43:21–5(d).

We add that earlier decisions of the Board of Review which have come to our attention are in harmony with the view we take here. In one matter the claimant was discharged and he, together with others who were discharged, picketed the employer's establishment to regain his job. The Board found there was no disqualification, saying "The picketing of the plant may be regarded as a labor dispute, but the cessation of work was not due thereto; rather the labor dispute was due to the discharge." 5 *Unemployment Compensation Interpretation Service, Benefit Series, No.* 10, *p.* 133 (March 26, 1942 —Docket No. BR-3878). In another case the Board held there was no disqualification because the stoppage of work was due to a lack of work attributable to a slack season and not to the labor dispute. 4 *Unemployment Compensation Interpretation Service, Benefit Series, No.* 6, *p.* 187 (Dec. 17, 1940— Docket No. BR-300L).

## II.

As noted above, the agency challenges the holding of the Appellate Division that the agency must furnish a transcript of the stenographic record without charge. We think the holding was correct.

*R. S.* 43:21–15(b) provides:

"Limitation of fees. No individual claiming benefits shall be charged *fees of any kind in any proceeding under this chapter by the commission or its representatives or by any court or any officer thereof.* Any individual claiming benefits in any proceeding before the board of review or a court may be represented by counsel or other duly authorized agent; but no such counsel or agents shall either charge or

receive for such services more than an amount approved by the board of review. Any person who violates any provision of this subsection shall, for each such offense, be fined not less than fifty dollars ($50.00) nor more than five hundred dollars ($500.00), or imprisoned for not more than six months, or both." (Emphasis added)

The agency's brief asserts "the cost of a transcript of testimony is an item of cost and not a fee." It refers to *N. J. S.* 22A:2–3 which says the Supreme Court may by rule provide for "such order for the payment of the cost of the transcript" as the Court may deem just. This provision is not part of the Unemployment Compensation Law but rather is part of the broad statutory treatment of "Fees and Costs" in judicial proceedings.

Let us define the terms. The word "fee" describes a charge made for a service rendered. The word "costs" here means an allowance made in favor of one litigant as against another. See 9A *Words and Phrases* (*perm. ed.* 1959–1960), Costs, *pp.* 634–636, and *Vol.* 16, *Fee; Fees — As a Charge,* *pp.* 525–526; Goodhart, "Costs," 38 *Yale L. J.* 849 (1929). Thus a payment for services made to the clerk of the court, to a witness, or to an attorney is a "fee," and if it is included among the items a party may recover from another, it is also a taxable "cost."

Hence "fees" and "costs" are not mutually exclusive. The charge for the transcript is a fee as between the stenographer and the party who pays the stenographer for it. The same charge, when taxed against another litigant, is part of costs. So our rules of Court refer to the stenographic charges as "fees" in the rule requiring a deposit to be made with the stenographer, *R. R.* 1:2–8(e), while in dealing with the taxation of costs recoverable by one party from another, the same item is called "the cost of the transcript." *R. R.* 1:9–2. This usage of "fees" and "costs" is reflected throughout the statute dealing with Fees and Costs. *N. J. S.* 22A:2–1, *et seq.* It is also reflected in our cases. See, for example, *United States Pipe and Foundry Co. v. United Steelworkers of America,* 37 *N. J.* 343, 355 (1962) ; *Barberi v. Bochinsky,* 43 *N. J. Super.*

186, 192 (*App. Div.* 1956) ; *Apperson v. Mutual Benefit Life Ins. Co.*, 38 *N. J. L.* 388, 389, 390 (*Sup. Ct.* 1876).

With this understanding of "fees" in mind, the statutory meaning becomes evident. Section 15(b) quoted above says a claimant shall not be charged "fees of any kind * * * by the commission or its representatives or by any court or any officer thereof." The stenographic record is transcribed by employees of the agency as part of their regular work. A charge by the agency to a claimant for the transcript would be a "fee" for the service so rendered.

In proscribing "fees of any kind," the Legislature meant to assist claimants in the prosecution of their claims. The Legislature doubtless felt that it would be too burdensome, especially in view of the amount of benefits involved ($1,300 maximum), to require a claimant to pay the charges the ordinary litigant must meet. Perhaps also the Legislature felt the proper enforcement of the basic plan concerns the public as well as the individual claimant and hence the fund should bear these expenses of litigation. Whatever the precise reasons, the legislative will is unmistakable. This intent is further revealed in *N. J. S. A.* 43:21–6(g) which requires the agency to pay the fees of witnesses summoned at the request of the claimant. That provision reads :

"Witness fees. Witnesses subpoenaed pursuant to this section shall be allowed fees at a rate fixed by the director. Such fees and all expenses of proceedings involving disputed claims shall be deemed a part of the expense of administering this chapter (R. S. 43:21–1 et seq.)."

The Board of Review also urges that if the charge for a stenographic transcript is held to be a fee within section 15(b), still that provision should be limited to transcripts required for proceedings before the agency itself, rather than for further review in the courts. It contends the phrase, "in any proceeding under this chapter," refers solely to the administrative process. We see no basis for that view. The word "chapter" refers to the entire Unemployment Compensation Law, *R. S.* 43:21–1 *et seq.* A proceeding does not cease to be

one under the Unemployment Compensation Law when the dispute passes to the courts. Indeed section 15(b) itself prohibits the charging of a fee "by any court," thus making it plain that a judicial review is a proceeding under the statute within the meaning of that section.

We note the agency's concern that claimants might burden it with routine demands for transcripts. The agency of course may require that a demand for a transcript be related to an actual appeal to the judiciary; the Legislature did not intend that every claimant may have a souvenir of his administrative experience.

The agency determination that the claimant make repayment and the judgment of the Appellate Division sustaining that determination are reversed. The judgment of the Appellate Division that the agency must furnish the stenographic transcript without fee is affirmed.

*For affirmance in part and reversal in part*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*Opposed*—None.