946 A.2d 1039

JOHN M. UTLEY, CLAIMANT–APPELLANT, v. BOARD OF RE-
VIEW, DEPARTMENT OF LABOR, RESPONDENT–RESPON-
DENT, AND MYRON MANUFACTURING CORPORATION, RE-
SPONDENT.

Argued November 27, 2007—Decided May 15, 2008.

*Stanley G. Sheats* argued the cause for appellant (*Anna P. Navatta,* Assistant Executive Director, Northeast New Jersey Legal Services, attorney).

*Todd A. Wigder,* Deputy Attorney General, argued the cause for respondent (*Anne Milgram,* Attorney General of New Jersey, attorney; *Lewis A. Scheindlin,* Assistant Attorney General, of counsel; *Mr. Wigder* and *Andrea R. Grundfest,* Deputy Attorney General, on the letter briefs).

*Melville D. Miller, Jr.,* President, argued the cause for amicus curiae Legal Services of New Jersey (*Mr. Miller,* attorney; *Mr. Miller, Lazlo J.G. Beh, Kristin A. Mateo and Keith G. Talbot,* on the brief).

Justice ALBIN delivered the opinion of the Court.

For thirteen years, John Utley worked for the same company, relying on public transportation to get to work because he is visually impaired. After his shift hours were changed to a time when buses were not running, Utley carpooled with a coworker. However, the company mandated that Utley work overtime, which resulted in his schedule not coinciding with the coworker. When the coworker had to leave the country for two weeks, the company refused to allow Utley to take his vacation time during the same two-week period. Without transportation to get home from work and fearing that he would be fired, he instead resigned.

The Board of Review of the Division of Unemployment and Disability Insurance (Board) denied Utley unemployment benefits on the basis that he quit his job "voluntarily without good cause attributable to [his] work." *N.J.S.A.* 43:21–5(a). The Appellate Division affirmed. We now reverse and hold that the undisputed facts support the conclusion that Utley resigned from the company for work-related rather than personal reasons, entitling him to his statutory unemployment benefits.

I.

A.

In 1992, John Utley began working as a material handler for Myron Manufacturing Corporation (Myron) in Maywood, New Jersey.[1] Utley was a model employee. For thirteen years, each

---

[1] The facts presented here are based on Utley's December 22, 2005 letter to the Appeal Tribunal of the Division of Unemployment and Disability Insurance and his testimony before the Tribunal on January 23, 2006. Those facts were not

work day, he took a bus from his home in Paterson, arriving at the Maywood site at 7:00 p.m., and, at the end of his shift at 5:30 a.m., returned home by bus. Utley relied on public transportation because his eyesight is so impaired that he is unable to drive a car.

In February 2005, Myron changed Utley's shift hours, requiring him to arrive at 3:30 p.m. and work until midnight, a time when there is no bus service from Paterson to Maywood. Utley—who at the time was earning approximately $12.00 an hour—brought his transportation problem to the attention of his supervisors. To adapt to the shift change, Utley at first carpooled home with a supervisor who lived in Hackensack. Before long, however, the supervisor decided that detouring to Paterson was too much of an imposition and stopped taking Utley home. Utley then found a coworker on his shift named Raquel to drive him home from work.

That arrangement proved satisfactory while Utley and Raquel worked the same hours, including the "mandatory overtime" required by Myron. But at some point Raquel was relieved of the mandatory overtime while Utley remained tethered to the longer hours demanded by the company. On some evenings, Raquel would wait the several hours until Utley's extended shift ended and then take him home. On other occasions, despite the mandatory overtime requirement, Utley would leave at midnight in order to catch his ride. The transportation problem brought about by the shift change persisted for nine months. Utley explained the situation to his supervisors, but they demanded that he work overtime despite the fact that he would be stranded at the end of his extended shift.

In November 2005, shortly before Thanksgiving, Raquel announced that she had to leave the country for two weeks to care for her ill father. Utley then attempted, without success, to find

---

contested by Myron. We note that Utley's letter indicated that he had worked for Myron for thirteen years whereas his transcribed testimony suggested his employment was for twenty-three years. It appears that there was an error in the transcription of the testimony.

another coworker with whom to carpool during her absence. With no alternative means of getting home, Utley asked his supervisor if he could use his accrued vacation time until Raquel returned. The supervisor refused Utley's request, stating that it was the "busy season" and that he did not want to encourage other employees to request time off. At about this time, Utley's supervisors chastised him for the occasions he left at midnight instead of working the mandatory overtime.

The stress from the constant friction with his supervisors became so overwhelming for Utley that it threatened his "mental and physical well being." Without available public transportation, Utley feared that he would be let go because he could not work to the end of his shift during the two weeks of Raquel's absence. Rather than be fired, he decided to leave the company.

The Division of Unemployment and Disability Insurance denied Utley's initial claim for unemployment benefits.[2] Utley then filed a request for review of the denial with the Division's Appeal Tribunal. In a letter to the Tribunal, Utley explained that "[i]f [his] supervisors would have just let [him] leave with [his] only ride home [he] would still be working" at Myron. He claimed that he "was forced by [his] supervisors and the shift hour changes to leave [his] job." A hearing was conducted before an appeals examiner, who took testimony from Utley. Myron did not participate in the hearing or provide testimony disputing Utley's account.

Thereafter, relying on *N.J.S.A.* 43:21–5(a), the appeals examiner rendered a decision—with virtually no factual analysis—holding that Utley's "leaving work due to lack of transportation" was "not connected to the work itself." The appeals examiner, it seems, believed that an employee who voluntarily quits his job because of lack of transportation is per se barred from receiving benefits. For that reason, the examiner concluded that Utley "left work voluntarily without good cause attributable to the work and [was]

---

[2] The Division, located within the Department of Labor and Workforce Development, is now called the Division of Unemployment Insurance.

therefore disqualified for benefits." The Division's Board of Review summarily upheld the decision of the appeals examiner.

### B.

In an unpublished, per curiam decision, the Appellate Division affirmed the Board of Review's denial of unemployment benefits to Utley. Relying on *Self v. Board of Review,* 91 *N.J.* 453, 453 *A.*2d 170 (1982), the panel noted that "[o]rdinarily, when transportation between work and home becomes unavailable resulting in loss of employment, the employee is disqualified for benefits." The panel compared Utley's case to those of employees who quit their jobs because of plant relocations that lengthen commuting time, as in *Morgan v. Board of Review,* 77 *N.J.Super.* 209, 185 *A.*2d 870 (App.Div.1962), and *Rolka v. Board of Review,* 332 *N.J.Super.* 1, 752 *A.*2d 790 (App.Div.2000). In *Morgan, supra,* before the relocation, the employee walked to work in twenty minutes; afterwards she commuted in excess of one hour, a commute that she accepted for three years and eight months before resigning. 77 *N.J.Super.* at 210–12, 185 *A.*2d 870. In denying unemployment benefits, the *Morgan* panel emphasized that the employee accepted the longer commute as one of the conditions of her employment by "continuing in the company's employ after the plant was moved." *Id.* at 214, 185 *A.*2d 870.

In *Rolka, supra,* the employee quit because the relocation of a business extended her commute from fifteen to twenty minutes to as long as two hours. 332 *N.J.Super.* at 3–4, 752 *A.*2d 790. The *Rolka* panel reversed the denial of unemployment benefits and remanded to the Board of Review, directing it to decide whether the reasons the employee left her job were attributable to her employer's relocation or to stresses in her personal life arising from the need to obtain child care for her newborn baby.[3] *Id.* at 4–6, 752 *A.*2d 790.

---

[3] Although not mentioned in the panel's decision in this case, the employee in *Rolka, supra,* commuted to the relocation site for several months before resigning. 332 *N.J.Super.* at 3, 752 *A.*2d 790.

The panel in this case found that because Utley "succeeded in commuting to work for" nine months after his shift change, his circumstances were comparable to those of the employee in *Morgan*, who continued commuting for years after the plant relocation. Based on that analysis, the panel concluded that "[t]he loss of transportation home from work for a two-week period was not attributable to [Utley's] work but was entirely personal to him."

We granted Utley's petition for certification. 191 *N.J.* 315, 923 *A.*2d 230 (2007).[4] We also granted Legal Services of New Jersey's motion to participate as amicus curiae.

## II.

Utley contends that because he left his position for "good cause attributable to [his] work" and not for personal reasons, he is entitled to unemployment benefits. He points out that for thirteen years he took public transportation to and from work due to his impaired vision and that only after both a unilateral shift change, which left him stranded with no available means of getting home, and his employer's refusal to offer any reasonable accommodation did he feel compelled to leave his job. Because he had taken every reasonable step to remain employed, Utley asserts that his attempts to continue working for nine months after the shift change, even when his employer impeded his efforts, should not be counted against him.

Amicus Legal Services of New Jersey maintains that Myron set in motion the chain of events that led to Utley's separation from employment. According to amicus, the shift change imposed on Utley should be considered a "discharge and an offer of 'new work.'" Viewed in that light, it submits that Utley had a right to reject the new employment arrangement as "unsuitable," for purposes of the unemployment compensation law, and should not

---

4 Although a named respondent in this matter, Myron did not file a response to Utley's appeal before the Appellate Division or file a response to the petition for certification.

be penalized for having made a good faith, though unsuccessful, effort to adapt to the new work schedule. Amicus contends that an employee should not be deprived of unemployment benefits when his employer refuses to make "temporary accommodations" to allow him to stay employed, noting that, here, Myron would not permit Utley to take accrued vacation time or to leave at the end of his shift to catch his ride. Amicus also notes that under the Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –49, an employer is forbidden from "imped[ing] a disabled individual's ability to 'obtain or maintain' work," (quoting *N.J.S.A.* 10:5–29.1), and that the regulations implementing our unemployment compensation law "incorporate protections to ensure that disabled individuals who have made 'reasonable efforts' to preserve their jobs are not denied benefits," (quoting *N.J.A.C.* 12:17–9.3(c)).

On the other hand, the Board of Review argues that Utley left his employment for personal, not work-related, reasons and therefore was rightly denied unemployment benefits. The Board focuses on the following facts to support its position: Utley "continued to work for the employer for [many] months after the change in his shift"; he lacked transportation for only two weeks; and he "resigned a full week before" Raquel—his ride home—went on a two-week vacation.[5] According to the Board, "the record shows that Utley's employer was compelled to deny his request for vacation because it was the employer's busy season and no vacations could be granted during that time." The Board also claims that LAD is irrelevant, insisting that Utley quit his job not because of a physical disability, but because of lack of transportation. The Board submits that Utley did not meet his burden of showing that he left his employment for good cause attributable to his work.

---

[5] Although the Board also argues that Utley "quit because he was angry with his employer for warning him about a prior incident in which he lost his temper when refusing to work mandatory overtime," that assertion is not supported by the record.

In determining whether Utley quit his employment for "good cause attributable to [the] work," we now look to the purpose animating our unemployment compensation law, the language of *N.J.S.A.* 43:21–5(a), the case law interpreting that statute, and the applicable regulation.

## III.

New Jersey's Unemployment Compensation Law (Compensation Act or Act) is social legislation that provides financial assistance to eligible workers suffering the distress and dislocation caused by unemployment. *Provident Inst. for Sav. v. Div. of Employment Sec.,* 32 *N.J.* 585, 590, 161 *A.*2d 497 (1960). In passing the Compensation Act in 1936, the Legislature declared that "economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state [and] . . . often falls with crushing force upon the unemployed worker and his family." *N.J.S.A.* 43:21–2. In essence, "the purpose of the [Compensation Act] is to provide some income for the worker earning nothing, because he is out of work through no fault or act of his own. . . ." *Battaglia v. Bd. of Review,* 14 *N.J.Super.* 24, 27, 81 *A.*2d 186 (App.Div.1951); *see also Yardville Supply Co. v. Bd. of Review,* 114 *N.J.* 371, 375, 554 *A.*2d 1337 (1989). "[T]o further its remedial and beneficial purposes," we have recognized that "the [Act] is to be construed liberally in favor of allowance of benefits." *Yardville Supply Co., supra,* 114 *N.J.* at 374, 554 *A.*2d 1337; *see also Provident, supra,* 32 *N.J.* at 590, 161 *A.*2d 497. There is little question that had Utley been *fired* because his new shift hours did not coincide with public transportation, thus requiring him to leave early, he would have been entitled to benefits under the Act. *See N.J.S.A.* 43:21–4 and –5. *See generally Sweeney v. Bd. of Review,* 43 *N.J.* 535, 539, 206 *A.*2d 345 (1965) ("The Unemployment Compensation Law seeks to ameliorate the impact of involuntary unemployment.").

The Act, however, protects not only workers who are involuntarily unemployed—those who are laid-off or terminated

from their jobs by their employers—but also those who voluntarily quit their jobs for good cause attributable to their work. *See Zubrycky v. ASA Apple, Inc.*, 381 *N.J.Super.* 162, 168, 885 *A.*2d 449 (App.Div.2005) ("The unemployment benefit law does not require that a plaintiff be either fired or constructively discharged in order to qualify for benefits." (citation omitted)). In its original form, the statute disqualified an employee from receiving unemployment benefits if he "ha[d] left work voluntarily without good cause." *L.* 1936, *c.* 270, § 5. Under that earlier iteration of the statute, quitting a job for a personal reason that constituted "good cause" entitled a worker to unemployment benefits. *Krauss v. A & M. Karagheusian, Inc.*, 13 *N.J.* 447, 464, 100 *A.*2d 277 (1953). The Legislature in 1936 "contemplated that when an individual voluntarily leaves a job under the pressure of circumstances which may reasonably be viewed as having compelled him to do so the termination of his employment is involuntary." *Ibid.* However, in 1961, the Legislature amended the Act "to eliminate the eligibility of persons who leave work for good, but personal, causes." *Self, supra,* 91 *N.J.* at 457, 453 *A.*2d 170.

*N.J.S.A.* 43:21–5(a) presently provides that an individual is disqualified for benefits "[f]or the week in which the individual has left work voluntarily without good cause attributable to such work, and for each week thereafter until the individual becomes reemployed." Accordingly, benefits are available to a worker who voluntarily leaves his job only if it is for "good cause attributable to [the] work." *Ibid.* Therefore, if Utley quit his job for "good cause attributable to [the] work," he is eligible for benefits, but if he left for personal reasons, however compelling, he is disqualified under the statute. We must determine whether Utley's lack of transportation, which led to his separation from employment, was caused by work-related factors or purely personal factors within his control.

It is clear that when "commuting problems" arise solely from the personal circumstances of the worker, unrelated to an alteration in the terms or conditions of employment, the worker

who voluntarily quits his job cannot show "good cause" qualifying him for benefits. *See Self, supra,* 91 *N.J.* at 460, 453 *A.*2d 170. That is the factual scenario that we addressed in *Self.* In that case, the two female claimants, both residents of Trenton, were employed at a corporate facility in Skillman, twenty miles away. *Id.* at 455, 453 *A.*2d 170. Because public transportation was unavailable between those two localities, they had to provide their own means of getting to work, which both acknowledged was a condition of their employment. *Ibid.* The two women drove together to the facility until the car they were using broke down. *Ibid.* They then rode with a coworker, who eventually quit her job. *Ibid.* Without any available transportation, the two women were compelled to "quit" their own jobs.[6] *See ibid.*

The Appellate Division overturned the decision of the Board of Review, which had denied the women unemployment benefits. *Id.* at 456, 453 *A.*2d 170. We then reversed the appellate panel and held that there was sufficient credible evidence in the record to support the Board's finding that the "claimants, by their lack of transportation to work, initiated the chain of events which led to their separation." *Id.* at 459, 453 *A.*2d 170. In *Self,* we recognized that " '[c]ommuting is *usually* considered a problem of the employee.' " *Id.* at 456, 453 *A.*2d 170 (emphasis added) (quoting *Morgan, supra,* 77 *N.J.Super.* at 214, 185 *A.*2d 870). Specifically, we determined that the "employer [in *Self*] did nothing to increase the commuting problems of claimants" and therefore "the reason they were unable to get to work was not work-related, but personal." *Id.* at 460, 453 *A.*2d 170. On that basis, we concluded that "the lack of transportation was not 'good cause attributable to' their employment within the purview of the statute." *Ibid.*

We acknowledged, however, that there could be circumstances in which the employer set in motion the chain of events that led to

[6] They had only been in the employ of the company for nine months. *Self v. Bd. of Review,* 182 *N.J.Super.* 361, 362, 440 *A.*2d 1364 (App.Div.1981), *rev'd,* 91 *N.J.* 453, 453 *A.*2d 170 (1982).

a worker's inability to get to work, thus qualifying that employee for benefits under the statute. *Id.* at 459–60, 453 *A.*2d 170. In support of that point, we quoted the dictum from *Bateman v. Board of Review,* 163 *N.J.Super.* 518, 395 *A.*2d 250 (App.Div.1978), in which the Appellate Division stated that "a case could possibly be envisaged in which a sudden change in employment circumstances greatly increasing the commuting distance from home to job would properly be regarded as a condition attributable to the work rather than to the employee." *Self, supra,* 91 *N.J.* at 459, 453 *A.*2d 170 (quoting *Bateman, supra,* 163 *N.J.Super.* at 521, 395 *A.*2d 250). Indeed, we distinguished the facts in *Self* from those in *Bateman,* in which the employee was required to begin work in a new facility, increasing his commuting time by three hours each way. *Ibid.* Bateman remained on the job and endured the commute for five years. *Ibid.* The Appellate Division in *Bateman* affirmed the Board's denial of unemployment benefits, which was grounded on the finding that Bateman "left work not because of the inconvenient commute, but simply to claim his pension." *Ibid.* The Appellate Division noted, however, that had Bateman quit shortly after the change in his working conditions, the outcome might have been different. *Id.* at 459–60, 453 *A.*2d 170.

Our discussion and seeming approval of the *Bateman* dictum in *Self* presaged the decision in *Rolka.*[7] In that case, Rolka commuted to her job, twenty minutes from her home, for several years. *Rolka, supra,* 332 *N.J.Super.* at 3, 752 *A.*2d 790. When the company for which she worked moved its operations, Rolka's commute increased from fifteen to twenty minutes each way to up to two hours each way. *Ibid.* Shortly after the move, Rolka went on maternity leave for four months. *Ibid.* On her return to work, she found that the stresses of family life and caring for a baby, which "were exacerbated, if not caused, by the much longer commute required by the employer's relocation," had become too

---

[7] It bears mentioning that the panel in *Rolka, supra,* concluded that the *Self* Court "inferentially recogniz[ed]" the validity of the dictum in *Bateman* "as a rule of approach." 332 *N.J.Super.* at 4–5, 752 *A.*2d 790.

much to bear. *Id.* at 3–4, 752 *A.*2d 790. She quit her job and was then denied unemployment benefits. *Ibid.*

The Appellate Division found that the Board had erred in characterizing *Self* as adopting "a mandatory rule" that " 'employees who leave work because of transportation or commuting difficulties leave without good cause attributable to the work and are disqualified for unemployment benefits.' " *Id.* at 5, 752 *A.*2d 790. Instead, the *Rolka* court determined that our decision in *Self* requires "a discrete balancing and evaluation of all factors ... [when] the claimant has made a showing of substantially increased commuting distance by reason of the employer's relocation, with significant personal inconvenience attributable to the move." *Ibid.* Accordingly, the appellate panel reversed the Board and remanded for it to determine whether Rolka's "conduct in quitting her job was an objectively reasonable response to the employer's choice to relocate" or whether her "action was, instead, primarily motivated by personal factors which, however related to the move, were essentially independent of it." *Id.* at 6, 752 *A.*2d 790.

Also relevant to our consideration is that in 1998, the Department of Labor promulgated regulations to guide the determinations of eligibility made by the Division of Unemployment and Disability Insurance, the Appeal Tribunal, and the Board of Review. *See* 30 *N.J.R.* 2027(a) (June 1, 1998) (codified at *N.J.A.C.* 12:17). Although *N.J.A.C.* 12:17–9.1(e) indicates that "separation from employment" due to "[l]ack of transportation" "shall be reviewed as a voluntarily leaving work issue" in deciding whether an individual is ineligible for unemployment benefits, *N.J.A.C.* 12:17–9.1(d) provides that "[a]n individual who leaves work for several reasons, one of which constitutes good cause attributable to such work, shall not be disqualified for benefits."

Significantly, during the comment period accompanying the proposal of *N.J.A.C.* 12:17–9.1(e), the Department of Labor noted that it "did not intend that this [regulation] automatically result in a finding of voluntarily leaving work without good cause attributable to the work when the leaving was due to" such reasons as

lack of transportation. 29 *N.J.R.* 5158(a) (Dec. 15, 1997). Instead, the Department advised the public that if an employee quit for a reason such as lack of transportation, the Department would be required to engage in "fact-finding" to determine whether the employee left for good cause attributable to the work. *Ibid.*

■ When *N.J.A.C.* 12:17–9.1(d) and (e), along with the Department of Labor's interpretive analysis, are read together, they embody the pragmatic approaches taken in *Self, Bateman,* and *Rolka,* which basically require a consideration of all relevant factors in deciding whether an employee has "left work voluntarily without good cause attributable to such work." *N.J.S.A.* 43:21–5(a). The term "lack of transportation" is not talismanic; it does not dispel the need to assess whether the employee left for work-related reasons.

We now apply the principles enunciated in the applicable statute, regulations, and case law to the facts in this case.

## IV.

■ Utley worked the same shift for thirteen years. During those years, he relied on public transportation—his only means of getting to work due to his poor eyesight. He did not have a "transportation problem" until his employer changed his shift to a time when buses were not available to take him home. His new working hours, to some degree, altered the conditions of his employment. Nevertheless, he did not quit. Rather, for nine months, he attempted to make do, first by carpooling with a supervisor and then with a coworker, Raquel. However, when his employer mandated that he work overtime, interfering with his ability to catch a ride home with Raquel, and barred him from taking his accrued vacation time to coincide with Raquel's two-week trip out of the country to care for her ill father, Utley concluded that he could no longer meet the company's demands and chose to leave with dignity rather than be fired. *See N.J.A.C.* 12:17–9.5 (providing that when employee knows that discharge is "imminent," meaning "within 60 days," that employee may volun-

tarily leave without becoming ineligible for benefits). Clearly, Utley did all that was " 'necessary and reasonable in order to remain employed.' " *Brady v. Bd. of Review*, 152 *N.J.* 197, 214, 704 *A.*2d 547 (1997) (quoting *Heulitt v. Bd. of Review*, 300 *N.J.Super.* 407, 414, 693 *A.*2d 155 (App.Div.1997)).

Utley's plight is unlike the misfortunes of the two women in *Self.* There, the only means of getting to work was by car. *Self, supra*, 91 *N.J.* at 455, 453 *A.*2d 170. They did so for nine months until the car they were using became inoperable. *See Self v. Bd. of Review*, 182 *N.J.Super.* 361, 362, 440 *A.*2d 1364 (App.Div.1981), *rev'd*, 91 *N.J.* 453, 453 *A.*2d 170 (1982). Unlike Utley's employer, their employer did nothing to alter the conditions of their employment that increased the difficulty of their getting to work. Unlike the claimants in *Bateman* and *Morgan*, who continued to commute to relocated company sites for five years and almost four years, respectively, only to retire with pensions, *Bateman, supra*, 163 *N.J.Super.* at 518–20, 395 *A.*2d 250; *Morgan, supra*, 77 *N.J.Super.* at 210–12, 185 *A.*2d 870, Utley attempted to adapt over nine months to the increasingly difficult conditions of his employment, and only when he realized that he could not meet the demands of his supervisors did he resign. It cannot be, as suggested by the Board, that had Utley quit at the time of his shift change he would have been entitled to unemployment benefits, but because he made bold efforts to maintain his employment over nine months that he is now somehow disqualified.[8]

The undisputed facts reveal that the altered working conditions of Utley's employment made it impossible for him to use public transportation, which he, as a sight-impaired individual, depended

---

[8] The Appellate Division's footnote indicating that Utley "did not address the availability of taxi service" is perhaps answered by the simple economics of a twelve-dollar-an-hour wage earner. Moreover, Utley's problems at work were more global. Utley's supervisors chastised him for not working overtime, even though doing so would have meant that he could not catch a ride home with a coworker, who was permitted to leave at the end of her shift. Therefore, Utley had to decide between disobeying orders or being stranded in Maywood.

on for thirteen years.[9]  In many ways, Utley's predicament is no different from those employees whose commuting hours are dramatically increased as a result of a work relocation, such as in *Rolka* and *Bateman. See Rolka, supra,* 332 *N.J.Super.* at 3, 752 *A.*2d 790; *Bateman, supra,* 163 *N.J.Super.* at 518–20, 395 *A.*2d 250.  The analysis should be no different.  In this case, the source of Utley's transportation woes was his employer, who initiated the chain of events that compelled him to quit his job.

## V.

The Division of Unemployment and Disability Insurance's appeals examiner apparently believed that "lack of transportation" is always personal to the employee and automatically disqualified Utley from entitlement to unemployment benefits.  In denying Utley benefits, with almost no factual analysis, the examiner briskly concluded, "Although leaving work due to lack of transportation may be a valid reason for leaving work, it is not connected to the work itself."  The Board of Review summarily affirmed the appeals examiner.

Utley's case called for a fact-sensitive analysis, not the mechanical approach taken by the appeals examiner, in assessing whether the reasons for Utley's departure from Myron were personal or work-related. *See N.J.A.C.* 12:17–9.1(d) ("An individual who leaves work for several reasons, one of which constitutes good cause attributable to such work, shall not be disqualified for benefits."); *Rolka, supra,* 332 *N.J.Super.* at 5, 752 *A.*2d 790 (requiring "a discrete balancing and evaluation of all factors"). The facts before the Board were undisputed.  The Board, however, affirmed a decision based on a mistake of law. *See Brambila v. Bd. of Review,* 124 *N.J.* 425, 441, 591 *A.*2d 605 (1991) (reversing

---

[9] Amicus Legal Services argues that the employer should have accommodated Utley's disability, citing LAD, *N.J.S.A.* 10:5–29.1, and the Americans with Disabilities Act of 1990, 42 *U.S.C.A.* §§ 12101 et seq.  That issue is not before us.

denial of benefits based on mistake of law, holding that claimant was "entitled to receive unemployment benefits").

■ Although in reviewing the decision of an administrative agency, we must give deference to the agency's findings of facts, *Jackson v. Concord Co.*, 54 *N.J.* 113, 117–18, 253 *A.*2d 793 (1969), and some deference to its "interpretation of statutes and regulations within its implementing and enforcing responsibility," *In re Appeal by Progressive Cas. Ins. Co.*, 307 *N.J.Super.* 93, 102, 704 *A.*2d 562 (App.Div.1997), we are "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue," *Mayflower Sec. Co. v. Bureau of Sec.*, 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973). *Cf. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.").

■ Under the language of the statute, the ultimate question is whether the employee left his job "without good cause attributable to [his] work." *N.J.S.A.* 43:21–5(a). A finding that an employee voluntarily left his job because of lack of transportation is not the end, but only one important part of the inquiry. As is clear from this case, all transportation problems do not originate with the employee; an employer may cause or exacerbate those problems. We do not retreat from our previous pronouncement that *generally* commuting troubles will not be considered work-related. *See Self, supra,* 91 *N.J.* at 460, 453 *A.*2d 170. In *Self,* we foresaw that a case might arise "in which a sudden change in employment circumstances" might make commuting so difficult that it could "properly be regarded as a condition attributable to the work rather than to the employee." *Id.* at 459, 453 *A.*2d 170 (quoting *Bateman, supra,* 163 *N.J.Super.* at 521, 395 *A.*2d 250). This is such a case.

For the reasons already discussed, we conclude that Utley's reasons for leaving his thirteen-year employment at Myron consti-

tuted good cause attributable to his work, entitling him to unemployment benefits.

## VI.

In summary, we hold that Utley satisfied his burden under *N.J.S.A.* 43:21–5(a) and *N.J.A.C.* 12:17–9.1 by showing that he quit his job for "good cause attributable to [his] work." We therefore reverse the judgment of the Appellate Division and remand to the Division of Unemployment Insurance for a determination of benefits consistent with this opinion.

Justice WALLACE, JR., dissenting.

I respectfully dissent. I view the case substantially the same as the Board of Review and the Appellate Division. That is, an employee's loss of transportation to and from work for a two-week period is not attributable to the employee's work, but is entirely personal to him.

The majority clearly sets forth the applicable principles in part III of its opinion. *Ante* at 543–48, 946 *A.*2d at 1044–47. However, I cannot subscribe to the path the majority weaves to reach its conclusion that claimant resigned from the company for work-related rather than for personal reasons.

It is not disputed that claimant has an eyesight problem. Because of that problem, claimant is unable to drive to and from work. During the time that his shift at work was from 7:00 p.m. to 5:30 a.m., claimant used public transportation to travel to and from work. However, when his employer changed his shift to 3:30 p.m. to 12:00 a.m., public transportation was not available. Therefore, claimant arranged transportation with a coworker. It was only after the coworker had to leave work for two weeks to care for a sick relative that claimant could not solve his transportation problem. The employer denied claimant's reasonable request to use his accrued vacation time during the period in which the coworker would be absent from work because he did not want to encourage other employees to request time off during the busy

season. Thereafter, claimant gave notice that he was leaving the job, explaining that his lack of transportation to work was the reason he decided to quit.

Although claimant had a good reason for quitting his job—he did not have transportation to work for a two-week period—that reason was not work-related, but was personal to him. The Court in *Self v. Board of Review* recognized that "the Legislature has designed a structure in which employees who leave work because of commuting problems are not entitled to unemployment compensation." 91 *N.J.* 453, 460, 453 *A.*2d 170 (1982). Similar to the claimants in *Self,* claimant was not confronted with a physical inability to work, but rather with a transportation problem. Our courts have consistently held that under those circumstances, quitting work is considered voluntary and not attributable to the work. *See Self, supra,* 91 *N.J.* 453, 453 *A.*2d 170; *Rolka v. Bd. of Review,* 332 *N.J.Super.* 1, 752 *A.*2d 790 (App.Div.2000); *White v. Bd. of Review,* 146 *N.J.Super.* 268, 369 *A.*2d 937 (App.Div.1977); *Morgan v. Bd. of Review,* 77 *N.J.Super.* 209, 185 *A.*2d 870 (App.Div.1962). Consequently, I conclude that claimant was not eligible to receive unemployment compensation.

Nevertheless, I acknowledge the concern advanced by Legal Services as Amicus that the policies behind the New Jersey Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –49, and its federal counterpart, the Americans with Disabilities Act (ADA), 42 *U.S.C.A.* §§ 12101 to 12213, might be implicated because claimant is legally blind. Legal Services notes that "[t]he LAD provides that 'it is an unlawful employment practice to deny to an otherwise qualified handicapped, blind or deaf person the opportunity to obtain or maintain employment,'" *N.J.S.A.* 10:5–29.1, and therefore "employers [must] make reasonable accommodations, which allow disabled employees to remain employed." Further, Legal Services observes that the public policies underlying the LAD and the ADA, as well as those underlying the New Jersey Unemployment Compensation Act, *N.J.S.A.* 43:21–1 to –24.30, function "not only to support the individual but also to address the resultant

societal harms" such as the health, morals, and welfare of the people of New Jersey. Therefore, Legal Services argues that because the employer failed to allow claimant, a blind person, to take a short leave of absence until his ride returned, "the remedial nature and strong public policies underlying [those acts] ... compel a finding that the employer's refusal to allow [claimant] a temporary two week leave accommodation that he requested constitutes 'good cause attributable to the work.' "

However, the fact that claimant is legally blind and therefore protected under the LAD and the ADA was not raised as an issue in this case. Claimant never informed his employer that he would be unable to work the new shift hours because of his handicap. Consequently, his request for leave did not implicate the requirement that his employer make an accommodation. *See N.J.A.C.* 13:13–2.5; *see also Tynan v. Vicinage 13 of the Superior Court of N.J.*, 351 *N.J.Super.* 385, 401, 798 *A.*2d 648 (App.Div.2002) ("While there are no magic words to seek an accommodation, the employee, however, 'must make clear that ... assistance [is desired] for his or her disability.' ")(quoting *Jones v. United Parcel Serv.*, 214 *F.*3d 402, 408 (3d Cir.2000)).

Claimant also never informed his employer that the reason he wanted vacation for the two weeks he did not have transportation was because of his handicap. Instead, he explained that the reason he needed vacation was because his driver was not available. Simply put, claimant's conduct did not trigger any accommodation requirement.

Justices RIVERA–SOTO and HOENS join in this dissent.

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA and ALBIN—4.

*For affirmance*—Justices WALLACE, RIVERA–SOTO and HOENS—3.