704 A.2d 562

IN THE MATTER OF THE APPEAL BY PROGRESSIVE CASUAL-
TY INSURANCE COMPANY FROM ORDER NO. A96–138 ISSUED
BY THE COMMISSIONER OF BANKING AND INSURANCE.

Superior Court of New Jersey
Appellate Division

Argued November 18, 1997—Decided December 23, 1997.

Before Judges PRESSLER, WALLACE and CARCHMAN.

*Douglas S. Eakeley* argued the cause for appellant Progressive Casualty Insurance Company (*Lowenstein, Sandler, Kohl, Fisher & Boylan*, attorneys; *Mr. Eakeley*, of counsel and on the brief with *Robert L. Lombardi*).

*Eleanor Heck*, Deputy Attorney General, argued the cause for respondent Commissioner of Banking and Insurance (*Peter Verniero*, Attorney General, attorney; *Joseph L. Yannotti*, Assistant Attorney General, of counsel; *Ms. Heck*, on the brief).

*M. Paige Berry* argued the cause for respondent New Jersey Commercial Automobile Insurance Plan (*Picco Herbert & Kennedy*, attorneys; *Ms. Berry*, of counsel and on the brief).

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

■ Progressive Casualty Insurance Company appeals from an order entered by the Acting Commissioner of Insurance (Commissioner) affirming, as neither arbitrary, capricious nor inconsistent with law, a determination by the Governing Committee of the New Jersey Commercial Automobile Insurance Plan (CAIP), following a hearing before it in September 1995, denying Progressive's application for adjustment of its participation data for 1988. The Governing Committee based its decision on Section 6.F.5 of CAIP's Operating Plan, effective July 15, 1990, requiring requests for data adjustment to be made within two and a half years following the end of the calendar year for which the adjustment is sought. The Governing Committee concluded that the limitations rule applied and denied the adjustment request, and the Commissioner accepted the factual findings and reasoning of the Committee while acknowledging that the Committee had the authority, which it declined to exercise, to grant an exception from the rule. We reverse. We are satisfied that the Commissioner erred in applying the substantial evidence rule to its review of the Committee's action and should have treated this as a contested case under the Administrative Procedure Act. We remand for that purpose.

CAIP was established in 1984 pursuant to *N.J.S.A.* 17:29D–1, as implemented by *N.J.A.C.* 11:3–1.1 to –1.10, for the purpose of providing an insurance mechanism for owners of commercial vehicles unable to obtain insurance in the voluntary market. CAIP is administered by a Governing Committee appointed by the Commissioner and acting in accordance with a Plan of Operation (Plan) approved by the Commissioner. *N.J.A.C.* 11:3–1.3. The membership of the Governing Committee is prescribed by *N.J.A.C.* 11:3–1.4, which allocates representative members to various industry groups. All insurers writing motor vehicle liability and physical damage coverage in this State are CAIP participants, *N.J.A.C.* 11:3–1.3, and a CAIP participant may apply, pursuant to the Plan, to be a servicing carrier. All servicing carriers have a seat on the Governing Committee, *N.J.A.C.* 11:3–1.4. Progressive became a

servicing carrier in 1988 and has had, since that time, a representative on the Governing Committee.

As we understand the Plan's operation in general terms, CAIP's profits and losses are apportioned annually among all participants in the proportion their voluntary premiums bear to the total of all voluntary premiums paid.[1] For the purpose of establishing the proportion ratios for each year, the premiums received by a servicing carrier for writing CAIP insurance are excluded from the calculation. We further understand that a national industry organization, the Automobile Insurance Plan Service Office (AIP-SO), headquartered in Rhode Island, is employed by CAIP to receive and analyze the annual premium data, make the ratio calculations, and apportion the benefits and risks of participation. We further understand that this scheme, including the use of AIPSO's services, has been adopted by a number of other states.

According to the record, during the early years of operation of the Plan, participants not infrequently requested an adjustment by AIPSO of their premium data well after the close of the calendar year for which it had been submitted, and, by and large, these requests were routinely granted, resulting in recalculations for those years of the CAIP's benefits and burdens among the participants. In 1988, Twin City Fire Insurance Company requested premium data adjustment for calendar year 1984 explaining that by error the data submitted to AIPSO had included premiums earned by it as a servicing carrier. AIPSO, relying on what it believed to be an industry-wide standard imposing a two-and-a-half-year limitations period on adjustment requests, referred the matter to the Governing Committee. The Governing Committee, relying on the two-and-a-half-year rule, denied Twin City's request, and Twin City appealed to the Commissioner. On May 15, 1989, then Commissioner of Insurance Kenneth D. Merin issued a

---

[1] The proportionate percentage arrived at is actually the percentage used to apportion benefits or burdens experienced two years later. That is, for example, the 1997 CAIP experience will be apportioned based on the 1995 premium-data ratios.

final decision and order under Order No. A89–122 by which he concluded that irrespective of whether the two-and-a-half-year rule was an industry-wide standard, the rule could not be applied by CAIP because it was not included in the Plan. Commissioner Merin reasoned that:

> The Governing Committee's rationale for denying Twin City's request is not sufficient to sustain their decision. The first point is based on a provision that is not contained in CAIP's Plan of Operation, and should not be applied to Twin City. If the 2½-year correction period limitation is a standard practice for AIPSO and the Governing Committee plans to enforce this rule, then, in my opinion, the rule should first be made a part of CAIP's Plan of Operation before it is applied to Service Carriers that adhere to the present stated provisions of CAIP.

As a result of the Commissioner's ruling in Twin City, AIPSO recalculated the participation percentages of all participants for the year in question.

As a further result of that ruling, the Governing Committee recommended a Plan amendment to incorporate the two-and-a-half-year rule. That amendment was approved by the Commissioner, and on July 15, 1990, Rule 6.F.5 became effective, providing in full as follows:

> All of the data necessary to comply with the foregoing participation procedures shall be reported to AIPSO by each company subscribing to this Plan or by the statistical agencies designated by such companies and each company agrees to permit its statistical agent to release such data to AIPSO.

> AIPSO shall periodically, but not less than quarterly, notify each company subscribing to this Plan of its Plan participation data.

> Corrections and adjustments to a given calendar year's voluntary base participation data will be accepted from a company for a period of 2-½ years from the close of the calendar year.

> Note: For example, companies may submit corrections to Calendar Year 1987 voluntary base data until June 30, 1990.

It is significant to note that several days before the effective date of the rule, two other servicing carriers, Aetna Casualty and Surety (Aetna) and Travelers Indemnity Company (Travelers) requested adjustment in their data as well. The Governing Committee granted Travelers' request on September 7, 1990, permitting it to correct its premium data for 1984, 1985 and 1986. Aetna's request was granted on November 13, 1990, resulting in

revision of its 1987 data. These adjustments resulted in recalculations of participation percentages for those years as well.

It is against this background that we address Progressive's situation. Progressive's statistical agents, to whom it provided its premium data, were Insurance Services Office (ISO) and National Association of Independent Insurers (NAII). Apparently, Progressive's commercial lines premium information was reported to ISO, who then transmitted that information to NAII for reporting to AIPSO. In November 1991 Robin Harbage, Progressive's corporate actuary, in reviewing the data, concluded that the premium data for 1988 and 1989 provided by NAII to AIPSO had been overstated and first realized, on further investigation, that NAII had failed to deduct its servicing carrier premiums. The record is not altogether clear as to what happened then. According to Harbage's testimony at the September 1995 Governing Committee hearing, he first communicated with a Progressive staff member, who was advised by NAII that the correct premium data should be resubmitted to it for transmission to AIPSO. Progressive apparently did so by letter in January or February 1992. At some later unspecified time, Harbage called AIPSO's then Director of Contract Services, Denise Palizza, who also testified at the hearing, and was advised that the corrected data had to come from NAII, which had not yet, apparently, transmitted it to AIPSO. According to Harbage, the corrected data for both years was finally sent by NAII to AIPSO in June 1992. As we understand what then transpired, AIPSO in fact accepted the corrected data for 1989, and presumably recalculated proportion percentages for that year. Harbage testified that he received no confirmation from AIPSO with respect to 1988. On further inquiry of AIPSO, he was advised by John Verruso, then AIPSO's manager of the New Jersey CAIP, who also testified at the hearing, to make a formal request to AIPSO for correction for 1988. Harbage did so by letter dated February 16, 1993. AIPSO then took the position that Rule 6.F.5 applied to the 1988 data and hence that the time for requesting adjustments had expired on June 30, 1991. Since Progressive had not requested adjustment

by that date—not surprising since it did not know of the error until the following November—AIPSO referred the matter to the Governing Committee on the ground that only the Committee had the power to grant an exception to the limitations rule.

When the Governing Committee first considered the matter in May 1994, it opted strictly to enforce the two-and-a-half-year rule and, consequently, voted to deny Progressive's request for adjustment of the 1988 data. Progressive appealed to the Commissioner, asserting, among other issues, that the rule should not be applied retroactively and that, in any event, the Governing Committee had granted prior exceptions, that its denial to Progressive of an exception was arbitrary, and that the rule was defective for failure to prescribe standards for exceptions. The Commissioner ultimately remanded the matter to the Governing Committee for consideration by it of the history, purpose, and prior application of the rule. The September 1995 hearing ensued, followed by the Governing Committee's written decision upholding the validity of the rule, finding it to have been uniformly applied, and declining to grant Progressive an exception. On Progressive's appeal to the Commissioner, the Governing Committee's decision was sustained. This appeal followed.

In challenging the Commissioner's decision, Progressive focuses primarily on the two-and-a-half-year rule and its application to its 1988 data-adjustment request. It argues that the rule should not be retroactively applied, that it lacks appropriate implementing standards, and that the Commissioner, in applying it, relied on errors in fact-finding and standards inconsistent with the applicable regulations and the CAIP Operating Plan. It also argues that the Commissioner lacked the authority to empower the Governing Committee to administer the CAIP Plan and to render an "initial decision" in this dispute.

█ To begin with, we have no difficulty in accepting the agency determination that the two-and-a-half-year rule is entitled to retroactive application. We recognize the general principle that legislation and administrative regulations are ordinarily accorded

prospective effect only. Nevertheless, as we recently explained in *Seashore Ambulatory Surg. Ctr. v. Dept. of Health,* 288 *N.J.Super.* 87, 97–98, 671 *A.2d* 1088 (App.Div.1996),

> the prospectivity rule is subject to certain exceptions. Thus, regulations may be retroactively applied where "the Legislature has expressed its intent, either explicitly or implicitly," that they should be so applied, "when the reasonable expectations of those affected by the [regulations] warrant such application," or when the regulation is ameliorative or curative. *Twiss v. State, Dept. of Treasury,* 124 *N.J.* 461, 467, 591 *A.2d* 913 (1991). *See also Frank A. Greek & Sons, Inc. [v. Township of South Brunswick],* 257 *N.J.Super.* [94] 106, 607 *A.2d* 1359 [(App.Div. 1992)] (citing *Gibbons [v. Gibbons],* 86 *N.J.* [515] 522, 432 *A.2d* 80 [(1981)]). However, retroactive application can only apply if such application will not result in " 'manifest injustice' to a party adversely affected." *Gibbons, supra,* 86 *N.J.* at 523, 432 *A.2d* 80.

*See also State v. Nagle,* 226 *N.J.Super.* 513, 516, 545 *A.2d* 182 (App.Div.1988).

We think it plain from the history of the adoption of Rule 6.F.5 that it was intended to be retroactively applied as a curative enactment. Every participant in the CAIP, and particularly those who, like Progressive, sat on the Governing Committee, was on notice of the Twin City decision, the 1990 adoption of the rule, of the fact that the two-and-a-half-year rule was an industry-wide standard, and that the policy driving the rule was not only finality for the participants but also avoidance of participant short-term manipulation of data.

We also are satisfied that according the rule retroactive effect does not create a manifest injustice to any of the participants. We reach this conclusion not only because of the foregoing considerations but also, and perhaps primarily, because of the understanding of AIPSO, the Governing Committee, and the Commissioner that the rule was never intended to be so strictly applied that appropriate exceptions could not be allowed as a discretionary matter. Indeed, the Commissioner's decision noted that "[t]he fact that a rule exists for which there is a reasonable basis does not mean that exceptions from it cannot be granted," and concluded that "[t]he Governing Committee can grant exceptions to the rule if it finds that strict application of the rule would

be unfair." An administrative agency's interpretation of statutes and regulations within its implementing and enforcing responsibility is ordinarily entitled to our deference. *See, e.g., Nelson v. Board of Educ. of Tp. of Old Bridge,* 148 *N.J.* 358, 364, 689 *A.*2d 1342 (1997); *Matter of Musick,* 143 *N.J.* 206, 217, 670 *A.*2d 11 (1996); *Kletzkin v. Borough of Spotswood Bd. of Educ.,* 136 *N.J.* 275, 278, 642 *A.*2d 993 (1994). We accept, therefore, the Commissioner's view, as well as the view of the Governing Committee and AIPSO, that exceptions to strict enforcement of the two-and-a-half-year rule are permissible to achieve fairness to all participants.

That conclusion brings us to what we believe is the crux of this case. Insofar as we read the Governing Committee's decision, the main reason for its insistence on strict enforcement of the rule here was its conclusion that exceptions had not been granted to others similarly situated, as Progressive had contended. We do not dispute the Governing Committee's determination in this regard. It was technically correct that neither Aetna nor Travelers, who obtained relief after the effective date of the rule in respect of Plan years going as far back as 1984, was similarly situated because both of them had made their requests for relief prior to the rule's effective date. The Governing Committee was also correct that two other participants that had obtained relief, Rutgers and Foremost, had entirely different claims than mere data adjustment. And, finally, the Governing Committee was correct that another company that was similarly situated, i.e., asking for data adjustment relief after the effective date of the rule and after the running of the two-and-a-half-year period, was denied relief.

But, in our view, rejection of the "similarly-situated" claim that Progressive made is not the end of the matter, but rather only the beginning. The question, as we see it, that was not adequately addressed either by the Governing Committee or the Commissioner was whether, in the totality of the specific circumstances surrounding Progressive's application, considered in the light of

the policy of the limitations rule, commonly understood notions of fairness dictated the grant of the exception. While we are aware that the rule itself prescribes no discrete standards for the grant of an exception, and perhaps should, we are nevertheless satisfied that the general standard of fairness in the circumstances is an adequate basis of decision, much akin to the general standard of substantial justice on the merits that governs the exercise of judicial discretion. *See, e.g., R.* 1:1–2. There are, moreover, in our view, a number of circumstances suggesting that denial of an exception to Progressive for 1988 was unfair. First, there is apparently no question that the 1988 data error was exclusively caused by an error made by Progressive's statistical agent of which it was entirely unaware. There is not the slightest suggestion that Progressive participated in the error in order to obtain any advantage from short-term data manipulation. Second, it could readily be found as a fact that Progressive acted with reasonable promptness in trying to correct the error once it discovered it—the discovery coming after the two-and-a-half-year period prescribed by the rule.[2] Of significance as well is the fact that the rule was not yet in effect during the year for which the adjustment was sought, that two other companies received far-back reaching adjustments requested just before the effective date of the rule without any explanation of when they discovered their errors, and that AIPSO, from prior experience, is obviously quite competent to the task of recalculation. Finally, we are told that the amount of money involved is an extra $2,000,000 Progressive must pay that, according to the Plan predicate, should have been apportioned among the other participants, who, as a result of this error by Progressive's statistical agents, will all receive a concomitant windfall.

---

[2] We are constrained to note CAIP's insistence throughout that Progressive waited until February 1993 to request the adjustment, over two years from the date of its discovery of the error. That is not so. As we have indicated, AIPSO received its adjustment data in June 1992 and accepted it as timely for 1989, since the two-and-a-half-year rule for 1989 did not expire until the end of June 1992.

And that observation leads us, finally, to our *ratio decidendi.* It is clear to us that Progressive is entitled to have administrative consideration of its exception claim. It is, however, equally clear to us that the Governing Committee is an inappropriate mechanism, in these circumstances, either to conduct the hearing or to render what is, in effect, an initial decision. We are aware that the applicable regulation, *N.J.A.C.* 11:3–1.1 to 1.10, commits the administration of CAIP to an industry-dominated Governing Committee, and we do not in any way intend to question the viability or soundness of that scheme. It is patently appropriate for insurance plans like CAIP, which apportions the risk of coverage for those unable to obtain insurance in the voluntary market, to be governed, under the oversight of the Commissioner and pursuant to an approved operating plan, by representatives of the industry who actually execute and bear the burden of the plan. But we think there is a vast difference between general industry self-governance and the kind of direct conflict of interest that was here involved.

The simple fact of the matter is that of the eleven members of the Governing Committee participating in this hearing, six were employees of and representing other Plan participants. Thus in addition to Progressive's representative, there were representatives of New Jersey Manufacturers, State Farm, Liberty Mutual, Selective Insurance and Aetna. While in the ordinary course of Governing Committee business, it may be assumed that the mutuality of the companies' industry interests predominate over their individual financial interests, it is plain that that could not have been the case here. Giving Progressive the relief of an exception to the limitations rule would have resulted in these companies bearing the major brunt of the reallocation of two million dollars. We do not suggest that any member of the Governing Committee was actually motivated by that consideration. But we nevertheless think that the apparent conflict is so obvious and so vitiating as to preclude the Governing Committee from deciding the issue. There is no question that a *per se* financial conflict rule applies to administrative agencies. *See, e.g., McVoy v. Board of Adjustment*

*of Montclair Tp.,* 213 *N.J.Super.* 109, 112, 516 *A.*2d 634 (App.Div. 1986); *Sokolinski v. Woodbridge Tp. Municipal Council,* 192 *N.J.Super.* 101, 469 *A.*2d 96 (App.Div.1983); *West Orange Licensed Bev. v. Bd. of Alc. Bev. Cont.,* 135 *N.J.Super.* 387, 343 *A.*2d 486 (App.Div.1975), *certif. denied,* 69 *N.J.* 395, 354 *A.*2d 323 (1976); *Bd. of Ed. of W.O. v. Intern. Union Eng.,* 109 *N.J.Super.* 116, 262 *A.*2d 426 (App.Div.1970). The *per se* conflict here is, in our view, sufficiently plain to require adjudication of Progressive's right to an exception by another body.

██ In deciding the Twin City case, Commissioner Merin noted that it would have been a contested case subject to the Administrative Procedure Act, *N.J.S.A.* 52:14B–1, *et seq.* had there been any genuine dispute of fact or exercise of discretion required. We note that that observation was entirely consistent with the applicable CAIP regulation, *N.J.A.C.* 11:3–1.10(b), which provides that "[a]n appeal to the Commissioner [from the Governing Committee] granted pursuant to this rule shall be conducted in accordance with applicable provisions of the Administrative Procedure Act. . . ." We recognize some anomaly in this provision, which suggests that the Governing Committee has initial authority to determine appeals, and the reference to the Administrative Procedure Act, which suggests contested-case resolution in the first instance by the Office of Administrative Law.[3] Irrespective, however, of the general scope of the Governing Committee appeal authority, we are satisfied that where the contested issue is one in which a majority of members of the Governing Committee has an obvious and direct financial interest, considerations of fundamental fairness and procedural due process require resort to the contested-case procedures of the Administrative Procedure Act. We, therefore, remand to the Commissioner for the implementation of

---

[3] We also note that the appeal authority of the Governing Committee is confirmed by Section 19A of the Operating Plan, which seems, however, to be drawn particularly in terms of coverage and policy-cancellation issues.

those procedures in respect of the contested issue, namely, whether under all of the circumstances in light of the policy of the two and a half-year rule, Progressive should be accorded an exception to the rule in respect of its 1988 premium data as a matter of fundamental fairness.[4]

The determination appealed from is reversed, and we remand for further proceedings consistent with this opinion.

---

[4] We are aware that Section 26 of *L.* 1997, *c.* 151, effective January 1, 1998, amends the CAIP enabling legislation, *N.J.S.A.* 17:29D–1, by the addition, in part, of the following provision:

> The governing board of any plan established pursuant to the commissioner's rules and regulations shall continue to exercise such administrative authority, subject to the commissioner's oversight and as provided in any rules and regulations promulgated pursuant to this section, as is necessary to ensure the plan's efficient operation, including, but not limited to, the authority to investigate complaints and hear appeals from applicants, insureds, producers, servicing carriers or participants about any matter pertaining to the plan's proper administration, as well as the authority to appoint subcommittees to hear such appeals. Any determination of an appeal by a plan's governing board shall be subject to review by the commissioner on the record below, and shall not be considered a contested case under the "Administrative Procedure Act," P.L.1968, c. 410 (C.52:14B–1 *et seq.*). The commissioner's determination shall be a final order and shall be subject to review by the Superior Court.

Since that legislation is not yet in effect, it is clearly inapplicable here. We do not, therefore, address the provision in the context of the inherent conflict of interest that has impelled us here to require a contested-case hearing under the Administrative Procedure Act.