**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2777-22

IN THE MATTER OF
MICHAEL PALINCZAR,
TRENTON POLICE
DEPARTMENT.

_____

Argued October 9, 2024 – Decided November 20, 2024

Before Judges Mayer, Rose and DeAlmeida.

On appeal from the New Jersey Civil Service Commission, Docket No. 2019-3130.

John P. Nulty, Jr. argued the cause for appellant (Mets Schiro & McGovern LLP, and Cammarata, Nulty & Garrigan LLC, attorneys; Nicholas P. Milewski, Jeffrey G. Garrigan, and John P. Nulty, Jr., of counsel and on the briefs).

Charles R. G. Simmons and Daniel H. Kline argued the cause for respondent Trenton Police Department (Simmons Law, LLC, attorneys; Charles R. G. Simmons, of counsel and on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent Civil Service Commission (Paulina R. DeAraujo, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Petitioner Michael Palinczar, a former officer with the Trenton Police Department, appeals from a May 3, 2023 final Civil Service Commission decision upholding his termination by the City of Trenton.

On de novo review, the Commission accepted and adopted the factual findings and legal conclusions of an administrative law judge (ALJ), who issued an initial decision, recommending Palinczar's removal. On appeal, Palinczar argues the ALJ's findings are not supported by the record. Alternatively, Palinczar challenges the penalty imposed as excessive. Because we conclude Palinczar failed to demonstrate the Commission's final decision was arbitrary, capricious, or unreasonable, see In re Stallworth, 208 N.J. 182, 194 (2011), we affirm.

I.

The five-day testimonial hearing before the ALJ was held virtually during the COVID-19 pandemic between October 19 and November 23, 2020. The City presented the testimony of six witnesses: Internal Affairs (IA) Detective Jason Snyder, who conducted the investigation; Matthew Guller, J.D., Ph.D., ABPP, the clinical psychologist who conducted Palinczar's fitness for duty (FFD) examination; IA Seargeant Gaetano Ponticiello, who issued the charges

2

against Palinczar; Lieutenant Peter Szpakowski, who testified about the Department's sick leave policy including stress leave; Hari Brundavanam, M.D., the emergency room doctor who treated Palinczar's female friend, T.L.,[1] for a suspected drug overdose; and Corey Fornarotto, the local officer[2] who was dispatched to Palinczar's home to assist T.L. The City moved into evidence sixty-five exhibits, including investigative reports. Palinczar testified on his own behalf; he did not call any witnesses. His documentary evidence included news articles and an "NAACP memorandum to police director."

The evidence adduced at the hearing is set forth at length in the ALJ's cogent written decision and need not be repeated here in the same level of detail. We summarize instead the facts that are pertinent to the issues raised on appeal.

Hired by the Department in 2001, Palinczar primarily served as a patrol officer. The precipitating event that led to the IA investigation – and the ensuing fifty-eight administrative charges filed against Palinczar – occurred at his home on the night of July 21, 2018, when Palinczar perceived T.L. had overdosed (the Incident). While they were watching television, T.L. went outside to smoke a

---

[1] Consistent with the administrative record, we use initials to identify lay persons.

[2] Palinczar lived in a suburb of the City of Trenton.

cigarette. Shortly after she returned, T.L. "slouched over" and was nonresponsive. Palinczar called 9-1-1 and performed CPR while waiting for emergency services. Palinczar smelled alcohol on T.L.'s breath. He found a small empty bottle of alcohol in her purse, but no evidence of drug use.

Fornarotto testified he was dispatched to the scene "for a person having difficulty breathing." When he arrived, however, Palinczar asked if Fornarotto "had the stuff to revive her." Understanding Palinczar meant T.L. "was overdosing on opioids," Fornarotto administered Narcan. Palinczar initially told Fornarotto T.L. "was just drinking." Another dose of Narcan was administered at the home. Upon further questioning, Palinczar initially indicated T.L. "may have taken a pill before arriving at his house" and then stated T.L. "may have taken [o]xycodone at his house."

Ultimately, Palinczar told the officer T.L. "did take an [o]xycodone at his house." Palinczar also told Fornarotto he wanted to keep the incident "on the down low" to avoid "get[ting] into trouble." At the hearing, Palinczar testified he was "petrified" while performing CPR on T.L. because he "d[id]n't want this woman to die" and "was worried about [his] job . . . find[ing] this out" as it "look[ed] bad." T.L. was revived at the hospital.

A-2777-22

After an extensive investigation of the Incident, IA officers uncovered a multitude of infractions, which occurred during overlapping time periods. We summarize the incidents in chronological order to lend context to the penalty imposed.

## A.  Unreported Sick Leave

Two months after the Incident, on September 11, 2018, Palinczar left his home to undergo surgery in another state while on sick leave for stress emanating from news coverage of the Incident. Contrary to the Department's sick leave policy,[3] Palinczar did not seek prior approval or notify his supervisor before the surgery. On October 17, after he returned to New Jersey, Palinczar so advised his supervisor.

Five days later, on October 22, however, Palinczar again left the state during his stress leave and entered inpatient drug rehabilitation in Florida, without seeking approval to leave the state during his sick leave and advising that he was undergoing rehabilitation. Palinczar did not advise the Department because it was his fourth treatment program and he "was embarrassed."

---

[3] Department General Order (DGO) 74-2 requires, in pertinent part, all members to: "[i]mmediately report sickness or injury"; "cite the illness, symptoms[,] or injury to the Administrative Desk Supervisor (ADR)"; and "not leave their residence during their scheduled tour of duty without the permission of the [ADR]."

### B.  Unreported Medication

In June 2014, Palinczar sustained injuries during an on-duty motor vehicle accident, which apparently caused chronic back pain.  From March 2015 to October 2018, Palinczar treated with Amit M. Goswami, M.D., who prescribed an opioid, oxycodone, for pain management.

Contrary to Department Rules (DR) 4:6.7[4] and 4:6.8,[5] Palinczar did not "immediately" disclose his prescribed opioid use to his supervisor.  At the hearing, Palinczar testified he was unaware of the Department's "medicine reporting rule and regulation," but claimed he made the disclosure to IA in September 2015, during a random drug test.  No documentary evidence was presented at the hearing to corroborate Palinczar's contention.  He also testified his regular physician, Dr. John Chung, prescribed oxycodone "once" when "Dr. Goswami wasn't around."

---

[4]  DR 4:6.7 provides:  "Employees shall not take any medication prior to or after reporting for duty that may diminish their alertness or impair their senses while on duty unless directed by a physician."

[5]  DR 4:6.8 provides:  "When employees are required to take any prescription medication that may diminish their alertness or impair their senses they shall immediately notify their immediate supervisor as to the medication, who shall then immediately communicate the information to their [c]ommanding [o]fficer. This information shall be confidential."

## C.  Unreported Motor Vehicle Incidents

Between October 2014 and November 2018, Palinczar loaned his personal automobile to various individuals who were involved in police reported incidents while driving his car.  On October 12, 2014, Palinczar called local police to remove Y.F. and another individual as "unwanted guests" who "refus[ed] to leave" his home.  The next day, however, Palinczar permitted Y.F. to use his car.  Y.F. drove the car while intoxicated and crashed into the rear of another vehicle.  Y.F.'s driver's license was suspended at the time of the crash.

On January 25, 2015, Palinczar permitted F.M. to operate his car.  While intoxicated, F.M. drove the car into a utility pole.  F.M.'s driver's license was suspended at the time of the crash.

On April 19, 2018, Palinczar permitted J.M.-W. to drive his car.  J.M.-W. and D.L., the mother of Palinczar's child, were arrested by the State Police for possession of controlled dangerous substances (CDS) following a motor vehicle stop.  J.M.-W. was issued a citation for driving without a valid license.

On May 2, 2018, D.L.'s sister, T.N., was arrested while driving Palinczar's car.  T.N. did not have a valid driver's license and was charged with possession of marijuana and outstanding municipal warrants.  In the car, the police found an April 24, 2018 "prescription blank for OxyContin" issued to Palinczar by Dr.

A-2777-22

Goswami. At the hearing, Palinczar acknowledged he was issued "a motor vehicle summons for allowing an unlicensed driver to drive [his] motor vehicle."

On November 29, 2018, Palinczar permitted M.W. to operate his car. Police stopped the car "for a tinted windows violation." Police issued M.W. summonses, including operating a vehicle while unlicensed.

Snyder testified Palinczar did not report any of these violations to the Department even though he knew the individuals who borrowed his car on May 2, 2018 were arrested for possessing CDS, and he was issued a summons and appeared in municipal court regarding the May 29, 2018 incident.

Also on November 29, 2018, Ponticiello telephoned Palinczar, requesting he report to IA to obtain his FFD report. In the report, Dr. Guller opined Palinczar was not fit for duty based on his November 19 interview and psychological testing. Palinczar advised Ponticiello he was in Florida because "[h]e had a death in the family" and would return to New Jersey on December 1. Palinczar acknowledged he had not "advised anybody that he was in Florida." The following day, on November 30, however, Palinczar contacted Ponticiello and advised he could come in that day. Palinczar claimed he "wasn't in Florida." He "was on [his] way but then . . . turned around . . . and came back."

A-2777-22

On April 11, 2019, Palinczar was issued a preliminary notice of disciplinary action (PNDA), suspending and charging him as follows:

- Charges one through thirteen: conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(a)(6), and misconduct, N.J.S.A. 40A:14-147;

- Charges fourteen through seventeen: incompetency, inefficiency or failure to perform duties, N.J.A.C. 4A:2-2.3(1), and misconduct, N.J.S.A. 40A:14-147;

- Charges eighteen through twenty-one: neglect of duty, N.J.A.C. 4A:2-2.3(a)(7), and misconduct, N.J.S.A. 40A:14-147;

- Charges twenty-two through thirty-four: other sufficient causes, N.J.A.C. 4A:2-2.3(a)(12), and misconduct, N.J.S.A. 40A:14-147;

- Charges thirty-five through thirty-eight: reporting violations of laws and rules, Department Rule (DR) 3:1.4, and misconduct, N.J.S.A. 40A:14-147;

- Charges thirty-nine through forty-three: performance of duty, DR 4:5.1, and misconduct, N.J.S.A. 40A:14-147;

- Charge forty-four and fifty: performance of duty, DR 3:1.5, and misconduct, N.J.S.A. 40A:14-147;

- Charges forty-five through forty-nine: neglect of duty, DR 4:5.11, and misconduct, N.J.S.A. 40A:14-147;

9

- Charges fifty-one and fifty-two: being under the influence of alcohol or drugs on duty, DR 4:6.2, and misconduct, N.J.S.A. 40A:14-147;

- Charges fifty-three and fifty-four: being under the influence of medication on duty, DR 4:6.7, and misconduct, N.J.S.A. 40A:14-147;

- Charge fifty-five: notification about medication, DR 4:6.8, and misconduct, N.J.S.A. 40A:14-147;

- Charges fifty-six and fifty-seven: truthfulness, DR 3:13.5, and misconduct, N.J.S.A. 40A:14-147; and

- Charge fifty-eight: sick leave, DGO 74-2, and misconduct, N.J.S.A. 40A:14-147.

Because Palinczar failed to request a departmental hearing within five days of receipt of the PNDA, a final notice of disciplinary action issued on April 18, 2018, terminating his employment. Palinczar filed an administrative appeal and the matter was transmitted to the Office of Administrative Law as a contested case. Prior to calling its first witness on the first day of trial, the City withdrew "the charges of impairment on the job," i.e., "charges four, twenty-five, fifty-one, and fifty-three."

10

The ALJ issued his decision on March 6, 2023.[6] In his forty-nine-page decision, the ALJ thoroughly summarized the evidence adduced at the hearing, made factual and credibility findings, and squarely addressed whether the City proved by a preponderance of the evidence that it properly terminated Palinczar's employment in view of the governing legal principles.

The ALJ credited the testimony of all the City's witnesses, except for Fornarotto, whom the ALJ found "was not a particularly credible witness." The ALJ found the testimony of Drs. Guller and Brundavanam "persuasive."

Conversely, the ALJ characterized Palinczar's testimony as "rehearsed" with "prepared answers." In three-and-one-half pages of his decision, the ALJ meticulously assessed Palinczar's credibility. Notably, the ALJ found Palinczar's testimony "left so many unanswered questions regarding Dr. Goswami[] that could have been addressed if [Dr.] Goswami had testified." The

---

[6] In his decision, the ALJ stated the record was reopened in August 2022, "for resubmission of summation briefs, which were received shortly thereafter." The record was closed in May 2021. On appeal, Palinczar asserts his attorney repeatedly contacted the court regarding the status of the decision. Ultimately, plaintiff's counsel contacted the Chief ALJ, who issued an order of extension nunc pro tunc, relaxing the time to render the initial decision for good cause based on the ALJ's "voluminous caseload" and "inadvertent oversight" in failing to request an extension. See N.J.S.A. 52:14B-10(c); N.J.A.C. 1:1-18.8.

ALJ concluded Palinczar's testimony was "self-serving and lacking in credibility."

Commencing with the Incident, the ALJ cited pertinent Department Rules and found T.L.'s "overdose . . . at [Palinczar's] home was both a possible crime and met the definition of 'unusual emergency event,' and . . . therefore [Palinczar] was responsible for reporting the Incident to his department." The ALJ concluded Palinczar "committed misconduct by failing to truthfully report the facts of T.L.'s overdose to the responsible officers and EMTs."

Turning to Palinczar's substance use, the ALJ found he "had been taking prescription OxyContin and oxycodone since at least 2015" yet failed to "advise his superiors about the numerous and various prescriptions for [these medications] and codeine." Noting Palinczar "claimed he had listed his medications on a form accompanying a drug test in 2015," the ALJ found Palinczar nonetheless "produced no evidence of any such disclosure[] and [the City] could locate no such form." Regardless, the ALJ found that disclosure did not "serve to fulfill the officer's obligations to report all medications that could impair his ability to work to his superiors." The ALJ thus concluded Palinczar's failure to report his "use of high doses of opioids . . . which might impair one's performance" violated "[DR] 4:6.8, and constituted misconduct under N.J.S.A.

40A:14-147, and failure to perform duties under N.J.A.C. 4A:2-2.3(a)(1), and [o]ther [s]ufficient [c]ause[s] as violations of departmental rules."

The ALJ further considered Palinczar's longstanding "abuse of narcotics" and "heavy alcohol consumption," evidenced by his treatment at five alcohol rehabilitation centers and another in opioid rehabilitation. Citing a health center report, the ALJ noted Palinczar was "advised on September 1, 2018, that [he] had been prescribed too high a dosage of opioids and that he should not be working at his job while on such a high dosage."

The ALJ also noted following Palinczar's FFD psychological examination, Dr. Guller found Palinczar's "opioid abuse" was "an extension of his alcohol abuse." Dr. Guller observed Palinczar "was taking very high dosages of opioids three times per day, although opioids should only be used 'as needed.'" The ALJ elaborated:

> [Dr. Guller] indicated that a person taking opioids three times daily would be an indication that the person was in constant pain; however, [Palinczar] was not in pain when examined by Dr. Guller. [Palinczar] told Dr. Guller he was only minimally using OxyContin and oxycodone, but Dr. Guller indicated that a person having prescriptions filled for high doses of opioids but not needing them or using them was an indication that the person was sharing his prescription drugs with other people. Dr. Guller indicated that a person could not work safely as a [law enforcement officer (LEO)] when taking opioids three times daily, and that police and

13

firefighters should not be on active duty when taking opioids. Dr. Guller stated that opioids were highly addictive and, for that reason, opioid use should end thirty to sixty days after the use commenced. Dr. Guller indicated that one of the prescribing doctors, Dr. Goswami, should have been suspicious about [Palinczar] using more than one kind of opioid, and about [Palinczar] travelling great distances and using many doctors and pharmacies to obtain drugs, which were indications of a person "doctor shopping" in order to receive additional drugs. Most telling was that Dr. Guller had recommended a Last Chance Agreement for [Palinczar], saying he should lose his job if he continued his substance abuse, and that [Palinczar] should attend intensive outpatient substance rehabilitation and join Narcotics Anonymous and Alcoholics Anonymous.

The ALJ found that because Palinczar failed to notify his supervisor of his years-long use of medication, "all indications were that [Palinczar] was attempting to cover[]up his opioid addiction." The ALJ therefore concluded [Palinczar]'s "history of opioid and alcohol abuse indicated that he used poor judgment and displayed a lack of truthfulness." The ALJ thus found Palinczar "engaged in misconduct as a police officer under N.J.S.A. 40A:14-147"; "displayed conduct unbecoming of a public employee, pursuant to N.J.A.C. 4A:2-2.3(a)(6)"; and concluded his behavior constituted "neglect of duty under N.J.A.C. 4A:2-2.3(a)(7)"; "and [o]ther [s]ufficient [c]ause pursuant to N.J.A.C. 4A:2-2.3(11)."

14

Citing the police reported incidents involving Palinczar's car, the ALJ found Palinczar "permitted unlicensed drivers to use his motor vehicle, in violation of N.J.S.A. 39:3-10." The ALJ further determined Palinczar "failed to report these inciden[ts] to his department . . . pursuant to [DR] 8[.]7."[7]

As for Palinczar's violation of the Department's sick leave rules, the ALJ cited the record evidence, including Palinczar's conversations with Ponticiello. The ALJ concluded Palinczar "failed to advise and request approval from his supervisor before leaving his home while on sick leave," and "lied to . . . Ponticiello when he said he was in Florida." The ALJ thus found Palinczar violated DGO 74-2. Further, "[Palinczar's] misrepresentation as to his whereabouts throughout his sick/stress leave period constituted conduct unbecoming, misconduct and failure to be truthful, in violation of [DRs]."

Finally, the ALJ referenced Palinczar's "many evasive responses, lies[,] and misrepresentations" during the course of the investigation. For example, the ALJ noted Palinczar implicitly requested Fornarotto administer Narcan to

---

[7] DR 8.7 is not contained in the record. The ALJ cited the City's "Exhibit 34," which is described in the appendix to the ALJ's initial report as "Trenton Police Rules Chapter 4." The ALJ summarized DR 8.7 as "any motor vehicle incident must be reported to the officer's superior, especially if a summons was issued on a personal offense." In any event, Palinczar does not challenge the ALJ's citation to the rule.

T.L. during the Incident, yet when Fornarotto inquired "what T.L. might have taken, [Palinczar] did not mention opioids." Further, the ALJ found Palinczar "lied about being under the influence of drugs" as he "admitted taking three opioid pills per day when he was off-duty, as he was the night of the Incident." The ALJ thus concluded, "such statements constituted conduct unbecoming a public employee under N.J.A.C. 4A:2-2.3(a)(6) and [o]ther [s]ufficient [c]ause."

Citing the litany of charges sustained against Palinczar and that the governing law holds law enforcement officers "to a higher standard of conduct than other employees," the ALJ concluded termination of employment "was warranted."

Palinczar filed timely exceptions on March 7, 2023, raising the same challenges to the ALJ's decision reiterated on appeal. In its final decision, the Commission independently evaluated the record and rejected Palinczar's exceptions. The Commission elaborated:

> [T]he exceptions filed by [Palinczar] are not persuasive in demonstrating that the ALJ's credibility determinations, or his findings and conclusions based on those determinations, were arbitrary, capricious or unreasonable. Specifically, the ALJ found [Palinczar]'s testimony not credible, finding he offered "rehearsed, prepared answers." For each of the proffered charges that were upheld, the ALJ provided his reasoning as to why the credible testimony and evidence in the record established those charges. The Commission finds

nothing in the record or [Palinczar]'s exceptions to question those determinations or the findings and conclusions made therefrom.

The Commission also reviewed the recommended penalty de novo. Citing seminal decisions issued by our Supreme Court, the Commission acknowledged it considers progressive discipline "when appropriate," see West New York v. Bock, 38 N.J. 500 (1962), but "where the underlying conduct is of an egregious nature, the imposition of a penalty up to and including removal is appropriate, regardless of an individual's disciplinary history[, s]ee Henry v. Rahway State Prison, 81 N.J. 571 (1980)." The Commission continued:

> It is settled that the theory of progressive discipline is not a "fixed and immutable rule to be followed without question." Rather, it is recognized that some disciplinary infractions are so serious that removal is appropriate notwithstanding a largely unblemished prior record. See Carter v. Bordentown, 191 N.J. 474 (2007).

Applying these principles in this matter, the Commission upheld the removal. Based on "the nature of infractions" and "[Palinczar]'s status as a [p]olice [o]fficer, the Commission f[ound] the penalty of removal neither disproportionate nor shocking to the consci[ence]."

On appeal, Palinczar renews his challenges to certain findings in the ALJ's decision, including: "T[.]L[.] suffered a drug overdose at Palinczar's house";

17

"Palinczar abused his lawfully prescribed medication"; and "Palinczar made false statements and was untruthful." Noting the City withdrew the charges related to Palinczar's intoxication on duty, he further argues the charges "cannot be sustained by a finding of narcotics abuse." Citing his "negligible" disciplinary history, Palinczar argues "the doctrine of progressive discipline dictates a lesser penalty than termination." Palinczar seeks dismissal of the disciplinary charges and reinstatement as an officer with the Department, with back pay and seniority. In the alternative, Palinczar seeks a new hearing before another ALJ.

II.

Well-settled principles guide our review. "Judicial review of agency determinations is limited." Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018). An agency decision will be upheld "unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence." In re Virtua-West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008); see also Stallworth, 208 N.J. at 194. "The burden of demonstrating that the agency's action was arbitrary,

capricious or unreasonable rests upon the person challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006).

A reviewing court "affords a 'strong presumption of reasonableness' to an administrative agency's exercise of its statutorily delegated responsibilities." Lavezzi v. State, 219 N.J. 163, 171 (2014) (quoting City of Newark v. Nat. Res. Council, Dep't of Env't Prot., 82 N.J. 530, 539 (1980)). That presumption is particularly strong when an agency is dealing with specialized matters within its area of expertise. See Newark, 82 N.J. at 540.

We therefore defer to "[a]n administrative agency's interpretation of statutes and regulations within its implementing and enforcing responsibility." Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J. Super. 52, 56 (App. Div. 2001) (alteration in original) (quoting In re Appeal by Progressive Cas. Ins. Co., 307 N.J. Super. 93, 102 (App. Div. 1997)). We do not substitute our judgment for that of the agency and, if there is any argument supporting the agency action, it must be affirmed. See Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 588 (1988); see also Stallworth, 208 N.J. at 194-95. "However, we are not bound by the agency's interpretation of a statute or resolution of a question of law." In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001).

Our deference to agency decisions "applies to the review of disciplinary sanctions as well." In re Herrmann, 192 N.J. 19, 28 (2007). That is because the Commission "is the entity charged with keeping State-government-wide standards of employee performance relatively consistent in disciplinary matters." See id. at 37. As our Supreme Court has made clear, "so long as the discipline . . . falls within a continuum of reasonable outcomes, we must defer, for we have no charge to substitute our judgment for that of the statutorily authorized decisionmaker." In re Hendrickson, 235 N.J. 145, 161 (2018).

Accordingly, "[a] reviewing court should alter a sanction imposed by an administrative agency only 'when necessary to bring the agency's action into conformity with its delegated authority.'" Herrmann, 192 N.J. at 28 (quoting In re Polk, 90 N.J. 550, 578 (1982)). We therefore lack the "power to act independently as an administrative tribunal or to substitute its judgment for that of the agency." Ibid. Because appellate courts defer to agency decisions, reviewing courts should consider "whether such punishment is 'so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness.'" Polk, 90 N.J. at 578 (quoting Pell v. Bd. of Educ. of Union Free Sch. Dist. No. 1, 34 N.Y.2d 222, 233 (1974)). "The threshold of 'shocking' the court's sense of fairness is a difficult one, not met

20

whenever the court would have reached a different result." Herrmann, 192 N.J. at 29.

Moreover, because "honesty, integrity, and truthfulness [are] essential traits for a law enforcement officer," our Supreme Court has upheld termination where, for example, an officer made conflicting statements to internal affairs investigators about an off-duty altercation. Ruroede v. Borough of Hasbrouck Heights, 214 N.J. 338, 362-63 (2013); see also State v. Gismondi, 353 N.J. Super. 178, 185 (App. Div. 2002) (recognizing "the qualifications required to hold [a law enforcement] position require a high level of honesty, integrity, sensitivity, and fairness in dealing with members of the public").

Applying these principles here, and having considered Palinczar's reprised contentions in light of the record and applicable legal principles, we conclude his claims are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E). Pursuant to our "limited" standard of review, Allstars Auto Grp., Inc., 234 N.J. at 157, we affirm, as did the Commissioner, substantially for the reasons expressed in the ALJ's comprehensive initial decision. After its de novo review, the Commission adopted the ALJ's findings, which were based, in large part, on the judge's credibility assessment of the witnesses and his conclusions of law that were firmly grounded in the governing

21

legal principles. We conclude the Commission's determination on these issues were "supported by sufficient credible evidence on the record as a whole," R. 2:11-3(e)(1)(D), and were not arbitrary, capricious, or unreasonable, thus warranting our deference. We add only the following brief comments concerning the penalty imposed.

The ALJ found Palinczar failed to "advise his superiors and ask permission to leave his home while on sick leave" to attend drug rehabilitation. The ALJ thus found Palinczar's "failure to tell the truth impeached all his testimony and could work against him if he ever had to testify in a trial resulting from an arrest he might make." Because Palinczar lacked regard for the Department's rules and our state's laws, the ALJ concluded his actions were "egregious." Clearly, Palinczar's lack of candor over the course of three years – before and after the Incident – underscores the gravity of the offenses sustained, warranting his removal from the Department.

We therefore are not persuaded by Palinczar's argument that the penalty of removal was excessive and unwarranted. We recognize the importance of Palinczar's status as a police officer, who "must present an image of personal integrity and dependability in order to have the respect of the public." In re Carter, 191 N.J. 474, 486 (2007) (quoting Twp. of Moorestown v. Armstrong,

22

89 N.J. Super. 560, 566 (App. Div. 1965)).  As our Supreme Court recently reiterated, "[d]ismissal of an officer is especially warranted for those 'infractions that [go] to the heart of the officer's <u>ability to be trusted to function appropriately in his position</u>.'"  <u>In re Ambroise</u>, 258 N.J. 180, 202 (2024) (quoting <u>Hermann</u>, 192 N.J. at 35).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2777-22