**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1212-23

RICHARD H. LAMBDON,

     Appellant,

v.

BOARD OF REVIEW,
DEPARTMENT OF LABOR,
and MONARCH BOILER
CONSTRUCTION CO., INC.,

     Respondents.

_____

Argued October 21, 2024 – Decided March 28, 2025

Before Judges Gummer and Jacobs.

On appeal from the Board of Review, Department of Labor, Docket No. 273555.

Noorzahan Kahn argued the cause for appellant (South Jersey Legal Services, Inc., attorneys; Noorzahan Kahn, Robert J. Cooper and Kenneth Goldman, on the briefs).

Gina Marie LaBrecque, Deputy Attorney General, argued the cause for respondent Board of Review (Matthew J. Platkin, Attorney General, attorney; Janet

Greenberg Cohen, Assistant Attorney General, of counsel; Eric A. Zimmerman, Deputy Attorney General, on the brief).

PER CURIAM

Claimant Richard Lambdon appeals from a final agency decision of the Board of Review deeming him ineligible for unemployment benefits under N.J.S.A. 43:21-5(a) and requiring him to refund benefit payments previously made to him. For the reasons that follow, we reverse.

I.

Claimant began working for Monarch Boiler Construction in 1995 as a maintenance worker. His last day of employment with Monarch was on June 4, 2021. He filed a claim for benefits on June 27, 2021, and received benefits totaling $8,272 for the weeks ending July 3, 2021, through October 16, 2021.

In an October 26, 2021 decision, the Department of Labor and Workforce Development disqualified him for benefits on the ground he had left work voluntarily without good cause attributable to work. The Department also issued a "non-fraud" refund request, requiring claimant to refund the $8,272 in benefits he had received pursuant to N.J.S.A. 43:21-16(d). Claimant appealed both decisions to the Appeal Tribunal.

The Appeal Tribunal conducted a telephonic hearing on May 16, 2022. During the hearing, claimant testified. He described Monarch as a company that performed "boiler repair and pipe work." The company was owned by "Amy," who "[did] all the paperwork." Amy's son, "Scott" "took care of . . . getting the jobs and . . . all the material that [they] needed for the jobs." According to claimant, the company had no other office jobs. Claimant worked in maintenance as a mechanic's helper. Monarch had a "small crew of guys" who would repair customer's boilers in two-man teams. He worked Monday through Friday and sometimes on the weekends. The work was "physical" and involved "bending down, kneeling down, lifting up, carry[ing] the material to where it's going to go . . . ." His job duties included working on repairing boilers, which required him to "go inside the boiler and cut the boiler tubes out." Claimant described the tubes as being sixteen to eighteen feet long and weighing between 125 to 150 pounds. He would have to carry them out by hand.

He testified he had noticed about two years earlier he was having difficulty at work. According to claimant, the work "put a toll on [his] knees." He could not bend his knees, and, if he did, he could not get back up. He also had hurt his shoulder carrying a ladder at work. He told Scott and Amy about his condition. Ultimately, he "[c]ouldn't do the work anymore. [His] knees,

A-1212-23

[his] shoulder, [he] just couldn't bend over, couldn't stoop down." He told his employer the reason he was leaving was that he "couldn't do the work." He could no longer "pull tubes out of boilers" or "climb ladders." According to claimant, Scott knew he was "seeing a doctor [and] getting shots in [his] knees."

Sometime in January or February, he told Scott he would be leaving in six months. When asked what reason he gave for leaving, claimant testified he had said he could not "do the work." According to claimant, Scott responded it was "good" he was leaving because Scott "was going to get his son to take [claimant's] place and [claimant] was going to be out . . . ." Claimant testified he also told Amy he was leaving because he couldn't "do the work anymore." Claimant denied ever telling his employer he was retiring. Although he testified he did not specifically ask if another position was available that would accommodate his condition, he stated he "gave them six months to reply to me about what else [he could] do." Claimant testified "there was no other position to get. Other than going out on a job and doing this tube work, repairing boilers."

Claimant testified about the medical treatment he had received and admitted into evidence his medical records. Claimant submitted proof of his visits with his orthopedist, including appointments on January 22, 2021, and April 23, 2021, and his physical therapist. The records indicate that during the

4

January 22, 2021 appointment, x-rays were taken of claimant's knees and claimant received treatment for "[p]rimary osteoarthritis of both knees." Claimant also submitted an April 11, 2022 letter from his orthopedist in which the doctor certified claimant was his patient and that he had been treating claimant "for osteoarthritis of bilateral knees" since January 22, 2021. The doctor stated:

> [Claimant] has expressed to me that his job was aggravating his osteoarthritis of bilateral knees. He is unable to do any kind of boiler work without it causing increased pain in both knees. I recommended that he seek other work in order to reduce his symptoms and improve his condition.

Amy Tarvis, whom the panel identified as claimant's employer, also testified at the hearing. She denied claimant had told her he could no longer do the work. She initially testified she "was told by everyone, including [claimant], that he was retiring." But on cross-examination she admitted she had never met with claimant or discussed his purported retirement with him. When questioned by the examiner, she said Scott, who did not testify or otherwise appear at the hearing, had told her claimant was retiring and that claimant had never told her he was retiring. She confirmed the positions at her company were for "[t]he same work that [claimant] did for [twenty-six] years." When asked if the work was "very labor intensive," she responded: "Well, it's a two-man crew. No one

5

is ever sent out on a job by themselves. And if they need [three] or [four] or [five], we would give them the extra work, the extra help." When asked what she would have done had claimant told her he was having difficulty with the work, she initially testified she would have suggested he pursue a disability claim. She later denied she would have told him to apply for disability and said she "would have sat down with him . . . as a coworker and see [if] maybe there are any options for him." Ultimately, she admitted the company had no other positions for which claimant was qualified that were not as labor intensive.

In a decision issued the day after the hearing, the Appeal Tribunal held that claimant had left work voluntarily without good cause attributable to the workplace and was disqualified for benefits as of May 30, 2021, citing N.J.S.A. 43:21-5(a). The Appeal Tribunal also held claimant had received an overpayment of benefits and had to refund $8,272. The Appeal Tribunal based that conclusion in part on the following factual findings: claimant had reported to his supervisor he was leaving due to retirement, claimant was available for other work within his physical limitations, claimant had submitted "notes, dated months after his separation, from his physical therapist and treating doctor," and his employer "indicated during the hearing there was no other work available for the claimant." Even though the employer had admitted "there was no other

6

work the claimant could have performed," the Tribunal nevertheless found that had claimant "discussed his circumstances, the employer could have presented him with other options." The Tribunal faulted claimant for not providing "medical documentation to show that the work aggravated his condition." The Tribunal characterized the medical records claimant had submitted as "narratives written by the medical providers . . . based on the claimant's assessment of his condition at the time of his separation and issued months later. They were not based on a medical examination which established the cause of his inability to perform the work."

Claimant filed a timely appeal from the decision of the Appeal Tribunal with the Board. The Board affirmed the Appeal Tribunal's decision in a November 16, 2023 final decision. The Board found claimant's medical records were dated in 2022, after his last day of work, and although the records verified claimant's medical condition, they did not show his job caused or aggravated his medical condition. The Board referenced a "medical note" that "indicated it was the claimant's opinion that the work aggravated his medical condition but the medical provider never directly made that assessment or prognosis on the medical documentation but rather 'recommended that he seek other work in order to reduce his symptoms and improve his condition.'" The Board

7

recognized claimant had submitted documentation of medical appointments as far back as January 22, 2021, but found that documentation "did not demonstrate that the health condition was caused or aggravated by the work." The Board indicated the employer had testified "if additional help was needed it could be requested and additional workers would be sent out to the job."[1] The Board faulted claimant for not seeking an accommodation.

This appeal followed. Claimant argues the Board's decision was based on a "plainly unreasonable application of the regulation" and was not supported by the weight of the substantial credible evidence and that the Board failed to give proper weight to the medical documentation claimant had submitted. We agree and, accordingly, reverse the Board's decision because it was arbitrary, capricious, unreasonable, and not supported by substantial credible evidence in the record.

---

[1] The Board's interpretation of this purported testimony does not match the words or context of Tarvis's actual testimony. She was not asked what would have happened if claimant had requested assistance due to the work aggravating the condition of his knees. Thus, we cannot make the inference from her testimony the Board made: had claimant requested that assistance, "additional workers would be sent out to the job." Instead, Tarvis was asked only if the work was "very labor intensive" and responded: "Well, it's a two-man crew. No one is ever sent out on a job by themselves. And if they need [three] or [four] or [five], we would give them the extra work, the extra help."

A-1212-23

## II.

"We review a decision made by an administrative agency entrusted to apply and enforce a statutory scheme under an enhanced deferential standard." E. Bay Drywall, LLC v. Dep't of Lab. & Workforce Dev., 251 N.J. 477, 493 (2022). We defer to an agency's interpretation of statutes and regulations "within the sphere of [its] authority, unless the interpretation is plainly unreasonable." Ibid. (quoting In re Election L. Enf't Comm'n Advisory Op. No. 01–2008, 201 N.J. 254, 262 (2010)) (internal quotation marks omitted); see also McKnight v. Bd. of Rev., Dep't of Lab., 476 N.J. Super. 154, 163 (App. Div. 2023) (finding, despite the usual judicial deference to an agency decision, a court may intervene when "an agency action is clearly inconsistent with [the agency's] statutory mission or with other State policy" (alteration in original) (quoting Futterman v. Bd. of Rev., Dep't of Lab., 421 N.J. Super. 281, 287 (App. Div. 2011))). Accordingly, "we will disturb an agency's adjudicatory decision only upon a finding that the decision is 'arbitrary, capricious or unreasonable,' or is unsupported 'by substantial credible evidence in the record as a whole.'" Sullivan v. Bd. of Rev., Dep't of Lab., 471 N.J. Super. 147, 155-56 (App. Div. 2022) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980)).

In making that determination, we are "guided by three major inquiries: (1) whether the agency's decision conforms with relevant law; (2) whether the decision is supported by substantial credible evidence in the record; and (3) whether, in applying the law to the facts, the administrative agency clearly erred in reaching its conclusion." Pugliese v. State-Operated Sch. Dist. of Newark, 454 N.J. Super. 495, 503 (App. Div. 2018) (quoting Twp. Pharmacy v. Div. of Med. Assistance & Health Servs., 432 N.J. Super. 273, 283-84 (App. Div. 2013)). "The burden of proving that an agency action is arbitrary, capricious, or unreasonable is on the challenger." Parsells v. Bd. of Educ., 472 N.J. Super. 369, 376 (App. Div. 2022). Claimant has met that burden.

This appeal involves claimant's entitlement to unemployment benefits. The Unemployment Compensation Law, N.J.S.A. 43:21-1 to -24.3, was enacted "to further an important public policy: alleviating the burden of involuntary unemployment, a burden that 'now so often falls with crushing force upon the unemployed worker and his family.'" Ardan v. Bd. of Rev., 231 N.J. 589, 601 (2018) (quoting N.J.S.A. 43:21-2). "[T]o further its remedial and beneficial purposes, the [Unemployment Compensation Law] is to be construed liberally in favor of allowance of benefits." Ibid. (second alteration in the original) (quoting Yardville Supply Co. v. Bd. of Rev., 114 N.J. 371, 374 (1989)). The

Unemployment Compensation Law "protects not only workers who are involuntarily unemployed—those who are laid-off or terminated from their jobs by their employers—but also those who voluntarily quit their jobs for good cause attributable to their work." Id. at 602 (quoting Utley v. Bd. of Rev., 194 N.J. 534, 543-44 (2008)).

A claimant who "'left work voluntarily without good cause attributable to such work'" is "disqualified from receiving benefits." Ibid. (quoting N.J.S.A. 43:21-5(a)). However, "certain claimants who left prior work due to medical conditions exacerbated by their working conditions" are "exempted from disqualification under N.J.S.A. 43:21-5(a)." Id. at 603.

> An individual who leaves a job due to a physical and/or mental condition or state of health which does not have a work-connected origin but is aggravated by working conditions will not be disqualified for benefits for voluntarily leaving work without good cause "attributable to such work," provided there was no other suitable work available which the individual could have performed within the limits of the disability.
>
> [N.J.A.C. 12:17-9.3(b).]

A claimant must demonstrate he or she "is within the parameters of N.J.A.C. 12:17-9.3(b)." Ardan, 231 N.J. at 603. To meet that burden, a claimant must show (i) an inability to work in his or her position due to a medical condition not connected to but aggravated by his or her working conditions; and (ii) "that,

11

at the time of the claimant's departure, either the employer had no position available that would accommodate the claimant's condition or the claimant would not have been assigned to any such position." Id. at 607; see also Israel v. Bally's Park Place, Inc., 283 N.J. Super. 1, 5 (App. Div. 1995) (finding a claimant was required to show her work environment aggravated her illness and met that standard "by showing, though uncontroverted medical evidence, that her disease has been and will be aggravated by the [work] environment").

In Ardan, the medical condition of the claimant, who was a nurse, was not disputed. 231 N.J. at 599. But she did not tell her employer about her condition, "did not investigate alternative nursing opportunities," and merely "surmised" her employer would not have been able or willing to place her in a position that would accommodate her condition. Id. at 607-08. Because nothing in the record supported her "conclusory assertion that any effort to secure a reassignment to 'suitable work' . . . would have proven futile" and because the claimant had "presented no proof that 'suitable work' was unavailable to her" at the hospital where she worked, the Court affirmed the Board's decision, finding the claimant had failed to demonstrate she fell within the parameters of N.J.S.A. 43:21-5(a). Ibid.

If in <u>Ardan</u>, our Supreme Court had held the Unemployment Compensation Law was to be construed narrowly favoring the disallowance of benefits, we could perhaps understand the decisions of the Board and Appeal Tribunal. But the Court in <u>Ardan</u>, consistent with its prior decisions, held the exact opposite, requiring the Law to be "construed liberally in favor of allowance of benefits." <u>Id.</u> at 601 (quoting <u>Yardville Supply Co.</u>, 114 N.J. at 375). The Board's and Appeal Tribunal's review of the evidence presented was at times inaccurate and at other times reflected an improperly narrow assessment of the evidence.

For example, the Board and Appeal Tribunal faulted claimant for failing to provide medical records demonstrating his work aggravated his condition and for submitting medical records dated after his employment had ended. In fact, claimant's submissions included records that predated the end of his employment and demonstrated he had received a diagnosis of and treatment for primary osteoarthritis of both knees several months before he left Monarch.

And claimant submitted a certified statement of his treating orthopedist. Although that certified statement was dated after claimant's employment with Monarch had ended, the doctor clearly was referencing a conclusion he had reached and a recommendation he had made before claimant left Monarch. The

doctor initially recognized claimant had expressed to him his job was aggravating the osteoarthritis in his knees. But the doctor then stated his conclusion claimant was "unable to do any kind of boiler work without it causing increased pain in both knees," a statement reasonably interpreted to mean claimant's work aggravated his condition by "causing increased pain in both knees." Moreover, the doctor stated he had recommended claimant "seek other work in order to reduce his symptoms and improve his condition." That recommendation to "seek other work" so claimant could "reduce his symptoms and improve his condition" was an inherent recognition by the doctor that claimant's work was increasing his symptoms and aggravating his condition. To conclude otherwise would be an improperly narrow view of the doctor's statement. Perhaps the doctor could have said more, but he nevertheless said enough to support claimant's contention his work aggravated his condition.

The Appeal Tribunal based its conclusion in part on a finding claimant had reported to his supervisor he was leaving due to retirement. Although Tarvis initially testified claimant had told her he was retiring, she later admitted she had never discussed retirement with claimant and that her son Scott, not claimant, had told her claimant was retiring. That hearsay statement does not constitute sufficient credible evidence to support the Appeal Tribunal's finding

14

that claimant had said he was leaving due to retirement. The Board neither expressly adopted nor rejected that inadequately supported finding.

The Appeal Tribunal found claimant was available for other work within his physical limitations while also finding his employer had acknowledged no other work was available for him. Instead of addressing those divergent conclusions, the Board faulted claimant for not expressly asking about the availability of other work at Monarch that could accommodate his condition. But here, as the Appeal Tribunal recognized, the employer testified no other position was available for claimant. Thus, unlike the claimant in Ardan, claimant had presented evidence – his employer's testimony – that supported his assertion "any effort to secure a reassignment to 'suitable work' . . . would have proven futile." Ardan, 231 N.J. at 607.

We conclude the Board employed an improperly narrow interpretation of the Law and rendered a decision that was unreasonable, arbitrary, capricious, and not supported by substantial credible evidence in the record. Having demonstrated he was "within the parameters of N.J.A.C. 12:17-9.3(b)," id. at 603, claimant was entitled to the benefits he received. Accordingly, we reverse the November 16, 2023 final decision of the Board, denying claimant the

15

benefits at issue and requiring him to refund the $8,272 benefits already paid to him, thus relieving him of the obligation to pay the refund.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

16                                                          A-1212-23